BREAUX, J.
Plaintiffs, property taxpayers in the Atchafalaya Basin Levee District and the Lafourche Basin Levee District, brought this suit to enjoin and prohibit the levee board of each of the districts just named from building a dam at the head of Bayou Lafourche, and afterward locks in the place of a dam, and to restrain defendants from doing certain dredgework.
In the year 1900 an act was adopted authorizing these two boards of levee commissioners to build locks at the head of this bayou., To that end, needful powér was delegated to them.
These boards are directed by the act of 1900 to consider in joint sessions all matters pertaining to the construction, maintenance, and management of the locks, but they are directed to vote thereon in separate sessions, each deciding for itself, and, in ease of a tie, *770 the Governor of the state is to be the final arbiter.
The act provides that the costs of the work shall be borne by these boards in the proportion of one-half each, and to meet the expenses they are authorized to issue separately their notes, payable at stated maturities.
In 1902, Congress took action in the matter, also the Secretary of War. The rivers’ and harbors’ bill, approved. June 13, 1902, sets forth that lock and dam may be constructed by the Atchafalaya and the Lafourche Basin Levee Boards of the state of Louisiana, to be paid for by these boards jointly as provided for by the act, to which we referred above. The works are to be subject to the supervision of the United States engineers, and the work is to be done in accordance with the plans and specifications of these boards, and is to be approved by the Secretary of War.
The Secretary of War, if in his judgment the United States will not be prejudiced thereby, is authorized to grant permission to these boards to place a temporary dam across the Bayou Lafourche, and to maintain the temporary dam for a period not exceeding two years and six months from the date the act was adopted in 1902; and the.act further provides that, before beginning the construction of this dam, the boards are to bind themselves as set forth in the act.
The Secretary of War gave his approval to the levee boards to place a temporary dam across the Bayou Lafourche.
Thereafter, in July 1902, the General Assembly passed a second act, supplemental of the act of 1900, authorizing these boards to place a temporary dam at the head of Bayou Lafourche to dredge Bayou Lafourche, construct pumps, syphons, and maintain a certain depth of fresh water, pending the construction of the locks.
In accordance with the requirements of the statute, articles of agreement were entered into between the levee boards and the United States government, through-one of the engineers of the government, directing, among other things, that earth was not to be removed within 50 feet of the base of the temporary dam or oft'-setting levee, and that, upon the removal of the dam, the earth was to be deposited in locality approved by the engineer of the general government. The whole work, it was stipulated, was to remain subject to approval of the district engineer. The stipulations looked to the safe navigation and to the construction of basins near the exit of the lock. There are many details in this agreement to which we will not specially refer.
The Board of State Engineers, through its chairman, in accordance with the request of the boards, submitted a report regarding the Lafourche, which was considered by these bodies before taking action. This report refers at some length to the laws to which we have before referred, and to the action of the general government in the premises. --
The engineers, in this report to the board, direct attention to certain restrictions which they say may make the accomplishment of the purpose of the levee boards difficult, if not uncertain. The report goes into.details, and shows wherein difficulties and uncertainties present themselves.
.Among these difficulties will be the maintenance of a channel of fresh water 6 feet deep and 60 feet wide, throughout the bayou,, from the time of placing the temporary danu until the completion of a lock. The report, suggests steps to be taken in order to meet-difficulties. We will not mention all the details of the work they suggest as proper to-that end. We will only mention that the engineers are of the opinion that the best method of carrying out the work will be to build' a temporary dam of earth in the same manner as an ordinary dike or levee, to dredge the bayou to the required depth and width wherever it will be needed in extreme low water, and to induce fresh water by opening canals from Lake Bceuf on the left bank of the bayou, or from Lakefield on the right bank, or from both. .
The cost of the work, to the extent stated, is estimated at $125,000.
After this report had been received, the board met and considered the nature and extent of the work. They adopted the report of the engineers, and ordained in line with the report.
The boards were preparing to build a dam at the head of the bayou, when they were enjoined on a number of grounds, mainly that these boards were without authority to build a dam, that they were acting in contravention of the duties imposed on them *772 by the acts under which they were created, against the organic law of the state, and, particularly, against articles 58, 238, 239, of the Constitution of 1898, also against articles 50, 213, and 214 of the Constitution of 1879.
Plaintiffs in injunction specially attack both Act No. 9, p. 8, of 1900, and Act No. 84, p. 115, of 1902, on the ground that it is an attempt through the General Assembly to permanently and totally close the bayou, without reference to the good and welfare of the thousand of inhabitants living on the banks of the bayou. Plaintiffs further urge that the funds required are to be taken from taxes not paid for any such work as that contemplated, as it is not the work of constructing 'and repairing levees, but work not connected therewith; that the money defendants propose to expend can only be used for the erection, repair, and maintenance of the levees; that the work proposed has naught to do with the erection, repair, and maintenance of the levees; that vesting in the Governor the .power to decide any disputed points between the boards is unconstitutional; that the act under which the boards are created is “local and special,” and no notice of any kind was published or given.
At the inception of our task of deciding the issues between plaintiffs and defendants, we recall the familiar principle that a legislative act is not null unless it conflicts in some way with the organic law.
We will stop for a moment, before regularly taking up the issues of the case, to mention that the question of jurisdiction raised by defendants is eliminated from the case by the expressed abandonment of that issue in open court made by counsel for defendants, by whom the issue had been raised.
Are the acts of 1900 and 1902 constitutional ? is one of the questions of plaintiffs we are called upon to consider and decide.
Since the adoption of an article in the organic law (article 50, Const. 1898, and article 48, Const. 1879) directed against the adoption by the Legislature of laws “local and special” without preceding advertisement in manner required, the courts have often been called upon to interpret its scope and meaning. The article in question has always been strictly construed.
It remains that the acts granting a charter to a levee board are not the “local or special” acts which must- be preceded by notice and publication. This court has decided that charters creating a municipal corporation, as in this instance, may be enacted (State v. Flower, 49 La. Ann. 1199, 22 South. 623; State v. Beeder, 44 La. Ann. 1007, 11 South. 816) without advertisement. See proviso of article 48 of the Constitution of 1898, requiring advertisement. This proviso exempts municipal corporations from the necessity of advertisement.
The acts of 1900 and 1902, attacked by plaintiffs, as before mentioned, are supplemental to the original charters which created the levee boards in question, and are intimately connected with and part'of these charters. The supplemental delegation of power is in a certain way as broad and comprehensive as the charters themselves.
If the acts of incorporation of the levee boards were properly excluded from the effects of article 48, they should also be excluded from the supplemental acts, attacked here, under which the boards are authorized and empowered to perform the before-mentioned work. One is not more amenable to the restriction of the Constitution than the other. They form one act — a merger for a particular purpose.
If the original acts creating levee boards had embraced the special delegation of power which is contained in Supplemental Act No. 9, p. 8, of 1900, and Act No. 84, p. 115, of 1902, it would have been legal without advertisement.
There are, among different powers delegated to the levee boards in the original acts creating these levee boards, certain powers as local as those attacked in the present suit.
It is not because the delegation of power to a municipal corporation is contained in separate acts that they are more subject of attack on the ground of the nonadvertisement before their adoption. What could have been done originally, may be accomplished by supplement.
But the supplement does not cover laws conclusively “local and special” in their nature. They are as broad and comprehensive as the other powers with which the levee boards are intrusted.
*774 .Plaintiffs further question the legality of the acts to which we have just referred, on the special ground that the Governor cannot be made the final judge or arbiter regarding differences which may arise between the corporations that are called upon to act together.
In our view, the Governor may be a member of the joint board without infringing upon the law requiring „ that his functions ■should neither be judicial nor legislative.
The lawmaking power, seeking to bring his influence to bear in matters of great public importance, has not invested him in this instance with a power interfering with the other departments. His functions are purely administrative.
If we were to go into details, we would find that he is only to see to the proper and legal execution of the laws, and the proper administration of the trusts and functions which have been delegated to these boards in matter of dam and lock in question. The Governor’s duties in the premises are neither legislative nor judicial. They are substantially similar" to the acts he is called upon to exert when he sits on the penitentiary board, or the board of the Charity Hospital, and other such boards.
Our best attention has not found a violation of the wise provision of our Constitution requiring that officers in one of the departments “shall not exercise power properly belonging to either of the others.” Article 17, Const.
This brings us to a consideration of a second ground of attack made by plaintiffs on Act No. 9, p. 8, of 1900 (different from those grounds before considered by us) to wit, that the title is defective and insufficient.
The title of Act No. 9, authorizing the board of commissioners of these two levee districts to place locks at the head of the bayou, sufficiently shows the intent of the act, and is therefore not amenable to the ■objection that the title does not disclose the object of the act. It is further urged in regard to this act that the extent of the duties ■of the State Treasurer in connection with the proposed work is not sufficiently indicated by the title.
To this we answer that a title must necessarily be concise and short. It performs all the functions of a title when it shows the-purpose of the law, and contains sufficient to indicate its outline as well as its details.
After having attacked the act because of the title being insufficient, as just mentioned, plaintiffs, through their able counsel, set up that the body of the act has more than one object.
It is true, we must say, that the intent to build a dam, construct or erect syphons and pumps, and to put in locks, would, as independent enterprises, not harmonize very well in one act; but, if all these are necessary in carrying out the object of the state in sustaining a comprehensive levee system, they would then become part of the same object.
It then has oneness of purpose, one thing is aimed at, one object is sought to be accomplished. It is all connected with the result sought, and indispensable to the maintenance of the system in question. The testimony does not show anything to the contrary.
An attack is also leveled by plaintiffs against Act No. 84, p. 115, of 1902, which is the companion act to Act No. 9, p. 8, of 1900, on the ground that it amends the latter act without copying it, and that this is violative of article 32 of the Constitution, which prohibits an amendment unless the act amended is recited anew in the amending act.
In some 'respects, we are aware that Act No. 84, p. 115, of 1902, is similar to Act No. 9, p. 8, of 1900, but in other respects it adds to the prior act. Act No. 84, amplifies and supplements Act No. 9, p. 8, of 1900, but does not change or amend it in any particular. It in the main adds new authority to the prior law by delegating new duties.
Act No. 84 -was not written as an amendment of the old law. It is accessory of, and not contrary to, the old law. It contains new and distinct propositions needful, the Legislature must have thought, in carrying out the object in view.
It would become cumbersome and confusing if, when it becomes necessary by legislation to delegate additional power in order to carry out the old law, it were required to insert, as plaintiffs contend, the whole of the old law in the new act, and publish the old and new law in full.
We have no idea that such is the intention *776 of article 32 of the Constitution, invoked by-plaintiffs in their attack on Act No. 9, p. 8, of 1900, and Act No. 84, p. 115, of 1902.
We leave this subject to take up the asserted violation of vested rights, which plaintiffs urge. We are impressed by the fact that the purpose is to achieve favorable results. If it should become evident that failure is imminent, an injury to individual rights inevitable, then the violation of vested rights might be brought forward, and the articles of the Constitution of the United States and of this state upon the subject of vested rights might be cited by plaintiffs and invoked for their protection.
But the testimony before us does not give rise to the thought that failure must follow, or that individual rights must suffer, in matter of the proposed work. Plaintiffs, through their able counsel, press upon our attention objections against the security which the United States government requires the defendant to furnish to the government to guaranty it against claim for damages in the suit of the owners of the adjacent lands or any one who is interested.
There is an agreement — unusual, we must say, if agreement it may be called — entered into between the levee boards and the general government on the lines just mentioned. This agreement does not abdicate the sovereignty of the state, as charged by plaintiffs, nor expose the state to expend large amounts -subject to the will and wishes of Congress.
The laws of the general government upon the subject are permissive. It is left to the state, through its levee boards, to execute them. Should the project prove a failure, then the general government, by requiring a bond, provides for its protection.
It is in the nature of an obligation on the part of these levee boards to properly carry out the permissive grants of the general government.
Plaintiffs charge that the work proposed has naught to do with the system of levees of the state. We see that this work was entered into by the levee boards, as we understand, in order to enable them to carry out a plan which will materially assist in maintaining the levee system of the state.
We will say at the outset, in taking up this question, that all the issues raised in this case áre serious and important.
But the most important question, and that giving the greatest trouble in deciding, relates to the asserted constitutional restrictions or limitations upon expenditure of funds, save for the purpose raised. Plaintiffs, in. support of their contention of unconstitutionality, urge that part of the work, if not the-whole of it, does not consist in work constituting part of the system of levees; that, if defendants are not restrained, it will result in diverting the public funds from the purpose to which they are lawfully and exclusively intended.
Plaintiffs, in seeking to sustain their position, invoke the definition of the word’ “levee,” and do not admit of any improvement, however necessary in connection with> the system of levees, unless it comes strictly within the closest interpretation of the meaning of the word “levee.”
It suggests itself to us to say here that the letter sometime “killeth,” and that, if only the strictest interpretation should be-followed, much work forming part of or accessory to the system of levees would have-hereafter to be condemned as unauthorized.
But this has not been the view heretofore-taken, and we do not think it was ■ the intention of the lawmaking power that the-levee, itself, was ¿11 with which the levee-boards should concern themselves; that it should only see to throwing up earth along-the river on either side in the form of a “levee.”
These boards have engineers whose offices; consist in suggesting needful improvements-in putting up work to prevent or stop crevasses, in draining levees, in building strong-embankments for the protection of the country.
Under a strict interpretation, all of these would have to be abandoned. Close interpretation should be adhered to as long as; possible, and nothing should be done unless; it comes within the meaning and intention of the law; but, in ascertaining the meaning- and intention of the law, we do not think that it was ever the intention to adhere to-the strictness of a word, regardless of the-text and of the law taken as a whole.
The object has been to establish a system-of levees. This embraces powers strictly needful to carry out the purpose. We use the words “strictly needful” deliberately, for- *778 the unnecessary and the mere experimental are always to be avoided in carrying out a delegated power. But within that purview (that is, strictly to carry out delegated powder) incidental powers may be exercised. The ■condition is that they (the incidental powers) must appear abundantly necessary to carry out the enumerated powers. Black, Constitutional Law, p. 214. This we understand ■to be the case here.
We illustrate as follows: The owner who builds a house must consider, as part of the ■expense of building, the amount it will require to restore the party wall and adjacent improvements of his neighbor taken down by him. It is an incident.
The owner who builds an embankment must pay the damages, or reinstate any one he may have damaged thereby. This is also an incident.
When the government becomes the builder, it also is bound by this common rule of ■equity and justice.
In our case the bayou must be dredged. The dredging becomes an incident of the whole work.
Heretofore, both the governments of the United States and of the state have taken a broad view of the subject, and, under a liberal construction, navigation and the levees have been considered in some respects as inseparable. Large amounts have been expended in carrying out that view, and many miles of levees constructed.
. In the case here, it was made a condition that there should not be an interruption of navigation in the Lafourche. In order to ■diminish the volume of water which flows into the bayou, defendants accepted the condition, and bound themselves to make locks ■and dredge the bayou, as before mentioned. This bayou measures about 75 miles in length, and has a levee on each side. By diminishing the volume of water, which is very great when the water is high, the levees are relieved from pressure the whole extent of the bayou.
As it is, every year a large amount is required toward maintaining the levees along this bayou, and yet there are breaks and crevasses.
From the days of the territory of Louisiana, levees have been built along this stream. When laws were enacted to organize a system for the protection of the state from inundation, the bayou was included in the system, and it also was placed in charge of engineers and boards. The record discloses that the Boards of United States Engineers and State Engineers have repeatedly recommended the closing of Lafourche, by lock or dam, as a matter of necessity to a more complete protection from the ruinous effect of crevasses.
We are informed that the volume of water running in at the mouth of the bayou is larger than can be discharged at the end of the stream where it debouches into the Gulf.
At the head, the formation is somewhat like a funnel. The inlet is large and increasing, while the sand carried by the current is forming bars and shallows near the Gulf. There is, in consequence, congestion of the water rising higher along the line than at the head of the stream. The result is as before mentioned — breaks or crevasjes, annually, in one of its levees, when the water is at its greatest height, and consequent loss and suffering.
Every year the levees have to be repaired and added to, and yet the desired protection is not obtained.
The engineers declare that they do not see their way to the protection of the land watered by this stream, if something be not done to cheek, and to some extent control, the inflow of the water.
Owing to the views of these engineers who have the matter in charge, legislation, both national and state, has declared in favor of their recommendation, and the state, through its lawmaking power, has conceived the idea that the proposed work enters into the system of levees of the state, and, from that point of view, enacted that the funds be raised as proposed, as part of the leVee fund.
The success of the contemplated work, if it proves successful, will do much toward determining that it is directly connected with the system of levees of the state. If the navigation be kept up, as it is said by the engineers and the defendants that it will be, during the time required for constructing the locks, the problem will solve itself. Plaintiffs will not have any cause to complain, and the trust funds specially appropriated for the building, repair, and maintenance of the levees will have been properly expended *780 for the benefit of the district where collected. (We imagine that not only the district is interested, but, in one way or other, the whole state also is interested in an efficient system of levees.)
If, on the other hand, there should be failure, the difficulty of maintaining the view that this proposed work was incidental to the system of levees will increase in proportion to the extent of the failure.
The question resolves itself into this: As recommended by the Board of Engineers, and with the result they say that will be obtained, it is a part of the system of public levees. If they are in error, then it is not. Can we assume that they are in error at this time, with the testimony before us, and can we assume that the work will prove a failure? We think not. Plaintiffs have offered no testimony upon the subject; that of defendants is absolutely affirmative in favor of the plan proposed.
If, in the course of the work, it becomes evident that the defendants are in error, it will be time to stop further perpetration of an error; at this time there is nothing of the sort before us.
It rested with the general government to enact a statute to the extent it has, looking to the performance of the work proposed. The general government has great power over its streams. See Cardwell v. Bridge Co., 113 U. S. 205, 5 Sup. Ct. 423, 28 L. Ed. 959. It was different in the early days of the Roman civil law. Streams were considered part of the public domain. They belonged to no one, not even the sovereign; each person had the right of use.
That law was logical and liberal. It classed public streams as public things, to which no. one acquired any particular right. It was a thing nullius, not owned to any greater extent by the republic than the humblest person. The legislation of all countries since have -paid little attention to the logical and literal right in the public, and it has been recognized as being in the highest sovereign authority. Here it is in the United States government.
The common law has gone even further in that direction than the civil law.
The sovereign authority has spoken, and has given its sanction to the plans proposed. In this instance we must attach importance to that sanction, only to the extent, however, that it is in harmony with local laws.
The sanction of the general government was necessary. It was obtained. It could not, however, impose a duty to be performed, by the state, as contended by plaintiffs, or a liability to be incurred, in matter such as now before us, in conflict with our own laws. The state requested the sanction. It was-given, subject to binding conditions imposed by the general government In carrying out the authority granted by the general government, the state and its subordinate authorities have sufficient power. They (the state and the boards) are not prohibited by the organic law, at least until it becomes manifest that the work is illegal, as contended: by plaintiffs.
The able and interesting argument of counsel for plaintiffs has not convinced us that the legislation should be annulled at this-time on the grounds urged, and with no more evidence than we have before us in their support. Nor are we convinced, after having read them, that the authorities they cite, commencing with Act No. 31, p. 76, of 1829, and O’Reilly v. Oakey, 4 La. Ann. 23, and others, ever contemplated the word “levee”' from the point of view of and connected with legislation, as in this case.
Plaintiffs’ further objection, that every obstruction of the Lafourche is guarantied' against and protected by the act admitting Louisiana into the Union, is interesting in an historical point of view, at least. But the act does not provide that the Mississippi river and the navigable rivers and waters leading into that river shall be common highways, without regard to the power and authority of the' general government.
The act (or similar provisions in acts admitting other states than Louisiana into the Union) has been interpreted by the highest judicial tribunal of the land, and that interpretation is not in accordance with the views of plaintiffs. It has been decided that the purport and meaning of the act is not as restrictive as plaintiffs would have it. The decisions have given effect to the principle that works can be done and improvements made on streams, provided the public be not irreparably inconvenienced and injured.
The decision cited infra, and those to which it refers, have gone into the subiect with *782 painstaking care, with the result before mentioned. See also Hamilton v. Railroad, 119 U. S. 285, 7 Sup. Ct. 206, 30 L. Ed. 393.
The work to which plaintiffs most seriously object (the locks and the dredging of the bayou) is that which is ordered in order to protect plaintiffs and the other interested persons on the Lafourche from being irreparably injured.
In our opinion, embankments, locks, and dams are not levees, hut they may enter into and form part of a comprehensive system of levees mentioned in the statutes relating to levees.
A fair stream directing its course to the sea through a fertile and beautiful valley is the subject.
It has given us some concern, yet we have not found a way satisfactory to ourselves to set aside the different statutes attacked.
Our learned Brother of the district court wrote an elaborate opinion. From his premises he may be correct.
We, from ours, are constrained to write a different judgment.
The law and the evidence being in favor of defendants, and against plaintiffs, the judgment appealed from is avoided, annulled, and reversed.
For reasons assigned, the petition of plaintiffs is dismissed, and their application for a writ of injunction is denied, and the prayer of their petition is rejected, at their costs in both courts.
NICHOLLS. O. J., recused.