LAND, J.
The plaintiff board in December, 1901, agreed to sell to defendants the N. W. % of section 2 and the N. % of section 3, township 19, range 15, containing 480 acres, at the rate of $12 per acre. The defendants were allowed 30 days to make a survey before taking title. No survey was made, but the defendants accepted the title tendered by the board, and paid the price in cash and notes pursuant to the agreement. The note first maturing was paid in April, 1905. The plaintiff board instituted executory proceedings to foreclose on the last note for $1,920, with interest, attorney’s fees, and costs. Defendants enjoined the sale on the ground that there was a map in the office of the said board at the time of said sale purporting to represent the correct location of said lands, and that according to said map ail of the lands conveyed lay east of a stream known as Big Pass; that the defendants have had said lands surveyed, and have learned that 101.8 acres, a portion of the N. Yz of section 3, lies west of the east bank of Big Pass, and is in the bed of a lake and of Big Pass; that said 101.8 acres cannot be reclaimed and put in cultivation, all or the-greater portion of the same being the bed of a navigable stream, and that it was not in-the power of said board to deliver such lands under the terms of the deed of sale. Defendants alleged a tender of the amount they admitted to be due on the note sued on after deducting the sum of $1,221.60, representing the price of the said 101.8 acres. For answer to the injunction suit the board denied the right of the defendants to a reduction of the price on any ground, pleaded the prescription of one year, and the insufficiency of the tender.
In the district court judgment was rendered in favor of the board dissolving the injunction, with damages for attorney fees. Defendants appealed, and the Court of Appeal reversed the judgment to the extent of holding that the defendants were entitled to-a credit of $634.80 representing the pro rata price of 52.90 acres lying wholly within the-bed of Big Pass, a navigable stream forming a part of the only navigable route from Shreveport to Jefferson.
The lands in question were not sold by-reference to any map or plat, but by sections, township, and range; the quantity being described as 480 acres, more or less. All of sections 2 and 3 were certified to the plaintiff board in July, 1901, under statutory authority by the register of the state land office and the State Auditor as swamp and overflowed lands belonging to the state of Louisiana. It appears from the certificate of said officials that the lands in question and other lands commonly known, classed, and identified as “dried-up lake lands,” had been duly surveyed and platted and had been conveyed to the- *403 plaintiff board, as provided by the statutes of the state.
The state of Louisiana has for more than half a century asserted title to the “shallow lakes” within the alluvial districts by virtue of the “swamp land” grants of 1849 and 1850. Defendants do not contest the title of the state or of the board to the lake lands included in the sale, but complain that the conveyance included the bed of a navigable stream, called “Big Pass,” the title to which is in the public, and which therefore is not susceptible of private ownership. Whether or not Big Pass is a navigable stream is a question of fact, which logically must be determined before we can consider the law applicable to the case. The Court of Appeal does not state on what evidence it reached the conclusion that Big Pass is a navigable stream.
The only evidence on the subject in the record is found in the testimony of J. M. Williams, surveyor, and of W. E. Glassel, one of the defendants. Mr. Williams made a survey for the defendants, and found that Big Pass crossed the N. % of section 3, and contained within its banks 52.9 acres. The following .question was propounded to this witness, to wit:
“Q. I will ask you whether or not you know Big Pass is the stream that is followed by steamboats, the steamboat route from Shreveport to Jefferson?”
The answer was:
“I understand it used to be.”
The witness does not pretend to have any personal knowledge of the matter inquired about, and does not state when Big' Pass was last navigable by steamboats. The witness evidently testified from hearsay, as his testimony shows that his knowledge of the locus did not extend back to the year 1902. Mr. Glassel has lived in the vicinity since 1890, and his knowledge of the matter ife disclosed by the following questions and answers, to wit:
“Q. Does this stream known as Big Pass ever go dry?
“A. Not in that section. I have never known it to go dry.
“Q. Is the Big Pass referred to on this map the stream of the regular steamboat route to Jefferson?
“A. Yes, sir; I always considered it. I have never seen a boat in the pass. I always understood that was the route; could not go any other way.”
The answers of this witness utterly fail to show that Big Pass is now or has been since 1890 a navigable stream. The witness does not give the width or depth of the water in the pass, and admits that he has never known it to be used for the purposes of commerce.
The most that can be predicated from the testimony of the two witnesses is that they understand that Big Pass at some indefinite time in the past formed a link in the steamboat route from Shreveport to Jefferson.
In. October, 1901, the registrar of the state land office certified to the Gaddo Levee Board sundry sections, containing 14,959.74 acres of land, within the limits of Clear Lake, Soda Lake, and Eerry Lake, commonly known, classed, and identified as “dried-up lake lands.”
The surveys show that the part of Big Pass now in dispute was included as an integral portion of the N. % of section 3, and was considered and supported by the state surveyor as falling within the category of “dried-up lake lands.” The drying up of these lakes on the ancient water route between Shreveport and Jefferson must have .seriously affected the volume of water flowing through Big Pass.
The evidence in the record is insufficient per se to show that Éig Pass is or was ever a navigable stream. Conceding that Big Pass was once'a navigable stream, the evidence before us tends to show that it has long ceased to be navigable for any useful commercial purpose. The right of the state to sell the *405 bed of a stream which has ceased to he navigable cannot be disputed.
Counsel for defendants in their brief go outside of the record to assert that until comparatively recent years there was constant navigation between Jefferson, Tex. and Shreveport, La.; that the railroads have forced the steamboat lines out of regular business, and for that reason it is only occasionally that the route is navigated.
Counsel refer to act of Congress of March 2, 1907 (Act March 2, 1907, c. 2609, 34 Stat. 1092), making an appropriation of $10,000 for improvement of Cypress bayou in Louisiana and Texas, and quote section 3 of said act (34 Stat. 1117) as directing a preliminary survey to be made of Caddo Lake, “with a view of determining the advisability of constructing a dam at the foot of said lake on the waterway connecting Jefferson, Texas, with Shreveport, Louisiana.”
The improvement ¡of Cypress bayou in Louisiana and Texas does not affect the locus in quo; nor is it apparent how the construction of a dam at the foot of Caddo Lake would affect Big Pass, which leads from Cad-do Lake into Soda Lake.
When a controversy shall arise between the United States and the state, or its assigns, as to the status of Big Pass, it will be time enough to consider the respective contentions of the parties. If, as the result of such a contention, the defendants should hereafter be evicted, they would have their recourse in warranty against the Caddo levee board.
Defendants had the privilege of surveying the lands before accepting the title, and cannot predicate error on their failure to have the lands surveyed. There was no deficiency in quantity, and the levee board did not warrant the character or quality of the land conveyed.
The title to the bed of Big Pass, if a navigable stream, vested in the state of Louisiana with the right to sell and convey the lands below high-water mark to any one, subject only to the paramount right of navigation in the public. Shively v. Bowlby, 152 U. S. 1-58, 14 Sup. Ct. 548, 38 L. Ed. 331. It was error to hold that such title was not in the state and that the bed was not susceptible of private .ownership. As the public has never claimed or exercised any rights of navigation in Big Pass since the sale to the defendants, we can perceive no present right on their part to complain.
It is therefore ordered that the judgment of the Court of Appeal be reversed, and that the judgment of the district court be reinstated and affirmed, defendants to pay all costs.
NICHOLLS, J. I concur in the decree.