Dear Mr. Curole:
On behalf of the South Lafourche Levee District, and, specifically related to a fresh water diversion endeavor by the Louisiana Department of Natural Resources (DNR), you have requested an opinion from this office regarding the authority of the State, and its agencies, to assert certain controls, including ownership and use, over the beds and banks of its navigable waterways and the water levels in State-owned waterways.
A. SPECIFIC ISSUES AND CONCLUSIONS: 1. "Is the State's ownership of Bayou Lafourche to the mean high water level when Louisiana became a state in 1812, or is it to the current water's edge?"
 The State's ownership of the bed of Bayou Lafourche is from the ordinary low-water mark of 1812 on one side of the Bayou to the ordinary low-water mark of 1812 on the opposite side of the Bayou, excluding any alluvion which accumulated by natural accretion until 1904, when a dam was installed upstream. Further, in 1904, the water level dropped because of the installation of the dam, thereby exposing a portion of the bed of the Bayou. The State owns that portion of the Bayou bed that was exposed, in its private sovereign capacity, rather than its public sovereign capacity, and any alluvion caused by natural accretion to that exposed bed as riparian owner. Finally, the State also owns the bed of the Bayou from today's low-water mark on one side to low-water mark on the other side. *Page 2 
 2. "Can the State and/or its agency control the water level in a State-owned water body?"
 In efforts to provide fresh water, prevent saltwater intrusion and to prevent pollution, the State and/or its agent may control the water level in a State-owned water body pursuant to legislative mandates contained in, but not limited to, La.R.S. 38:3086.21, et. seq.
B. ISSUE ONE — GENERAL CONCLUSIONS:
As an overview to this opinion, under Louisiana law, historically and in general, the following basic conclusions apply to the bed and banks of Bayou Lafourche (the Bayou). The Bayou has been, and still is, a naturally navigable waterway — a distributary of the Mississippi River. As such, the bed of the Bayou, that portion of the bed covered when the water is at its naturally low stage, is owned by the State of Louisiana in its capacity as a public person. The riparian owners of the land adjacent to the Bayou own the banks, which are subject to public use. The banks of the Bayou are the portions of the land covered with water between the ordinary low and the ordinary high stages of the water. If there are any levees, placed by a public entity, those levees form part of the bank. Natural accretions along the banks of a naturally navigable waterway belong to the riparian owner. Artificial dirt works on the bed of the Bayou do not serve to convert ownership of the bed of the Bayou from the State to a private individual.[1] There are some general principles of Louisiana law which can be applied today to give guidance to any effort to replenish the fresh water necessary in the Bayou. It is with a great respect for ownership, the duties of the State and its agencies, and the freshwater needs of the people living along this Bayou, that we tread into the territory of ownership.
It should be noted here that this opinion is only a surface analysis of basic ownership issues and does not address issues involving such concerns as individual boundaries, archaeological sites, (of which there are at least twenty *Page 3 
nine (29) along the Bayou), [2] wetlands issues and issues of environmental concerns. Each of these issues should also be evaluated before any dredging, dumping and spreading activities are commenced. Also, this opinion does not address any possible federal issues related to this project. These issues were not posed as part of the request for our opinion. With these caveats, we begin with a history and description of Bayou Lafourche.
C. ANALYSIS 1. HISTORY, NAVIGABILITY, LOW WATER MARK, BED OF BAYOU AND LINE OFSTATE OWNERSHIP
 a. History:
Beginning at the town of Donaldsonville, and flowing through the Parishes of Ascension, Assumption and Lafourche, as a natural distributary of the Mississippi River, the Bayou empties, after 110 miles, into the Gulf of Mexico. Since 1903, levees, locks, and other flood control structures have been constructed, which artificially reduced the volume of water entering the Bayou from the Mississippi River. As a distributary of the Mississippi River, the Bayou historically carried 10-20% of the Mississippi's flow, thereby providing freshwater to the people who inhabited its banks and maintaining the navigability of the Bayou for commerce.[3] In addition, the Mississippi's waters were a source of freshwater, sediments, and nutrients to the surrounding wetlands.[4]
In 1904, primarily as a flood protection measure, the Bayou was scaled-off from the Mississippi River by the construction of a levee. Therefore, in 1904, the low-water mark dropped because the levee stopped the water flow. Though the levee relieved the problem of periodic flooding, it also eliminated a needed source of freshwater both for drinking water and for wetlands replenishment.[5]
 b. Navigability
The first question to be answered is whether or not the Bayou was navigable in 1812. Water bodies that were navigable in 1812, the year Louisiana was *Page 4 
admitted to the Union, and continue to be navigable, are public things.[6] In general, a body of water is navigable if it is susceptible of being used, in its ordinary condition, as a highway of commerce "over which trade and travel are, or may be conducted in the customary modes of trade and travel on water."[7]
When Louisiana was admitted to the Union as a sovereign state in 1812, the Bayou was a natural, free-flowing, navigable bayou. There is not one single Louisiana case that indicates anything other than the fact that this Bayou was, and continues to be, navigable. The reported Louisiana legal analysis in support of navigability, begins in 1903 with Dehon v.Lafourche Basin Levee Board, 34 So. 770 (La. 1903), reh'g denied, and ends most recently with Safford v. Bayou Lafourche Fresh Water District, 2003-0700 (La.App. 1 Cir. 2/23/04) 872 So.2d 1127, writ denied, 2004-0747 (La. 5/7/04) 872 So.2d 1086. Both of these cases find, or take judicial notice that, the Bayou is navigable with no hesitation whatsoever. Clearly, there was no question of this fact in the minds of these courts, nor was navigability contested. In addition, in a 1947 report prepared by the Louisiana Department of Public Works regarding the improvements considered on the Bayou at that time, there is a commerce graph prepared by the U.S. Army Corps of Engineers. This graph depicts the tonnage of commerce on the Bayou from 1890 through 1944. The report explains:
 . . .It is possible that the slump in tonnage during the period between 1901 and 1911 was attributable to closure of the Bayou at its head. It is noted that a similar slump was experienced between 1923 and 1928 during which period highway improvements were affected. No doubt a large portion of the increase in tonnage which has obtained since 1933 is attributable to the Intracoastal Waterway. The shipping data show that during this period since 1933 crude petroleum constituted 97 percent of all outbound domestic commerce and that during the war this figure was 99 percent. This commodity was of course destined for refineries in Louisiana and Texas.[8]
Given the jurisprudence and report cited above, under Louisiana law, navigability of the Bayou is not an issue in fact or in law.
However, although we do not believe that this is the case, even if all or part of a stream such as the Bayou were deemed to have become non-navigable at any *Page 5 
time since 1812, as Professor Yiannopoulos observes,
 there is no reason to assume that the water body ceases to belong to the state. The formerly navigable water body is a private thing that belongs to the state in its capacity as a private person. The termination of the public interest in the free use of the waters for navigation and transportation does not entail a termination of the state's ownership.[9]
In such a case, the public rights to use the bank for purposes incidental to navigation would terminate, but the ownership interests would not change.
c. Public vs. Private:
The second issue is whether or not the waters and bottoms of the Bayou are public or private things. The Louisiana Civil Codes of 1808, 1825, and 1870 placed navigable rivers in the category of public things.[10]
No other navigable water body was mentioned in the Louisiana Civil Code until the 1978 revision. Article 450 of the Louisiana Civil Code now declares that "the waters and bottoms of natural navigable water bodies"[11] are public things. These are insusceptible of private ownership and are owned by the State in its capacity as a public person. The waters of natural, navigable water bodies are subject to public use;[12] but, their beds or bottoms may only be used or exploited by private persons in accordance with the terms of a lease or license granted by the public authorities.[13] *Page 6 
The State owns the bed of the river, that is, the land lying between the ordinary low stage of the water on the one side and the ordinary low stage of the water on the other side, in its capacity as a public person.[14] The bank of a river, that is, the area between the ordinary low and the ordinary high stage of the water, is a private thing; it belongs to the riparian owner and is subject to public use.[15] Lands that become the bed of a navigable river belong to the State in its capacity as a public person. However, accretions and derelictions formed at the bank of a navigable river belong to the riparian owner.[16]
"Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public use. The same rule applies to dereliction formed by water receding imperceptibly from a bank of a river or stream. The owner of the land situated at the edge of the bank left dry owns the dereliction.[17]
d. Low water mark and the bed of the Bayou in 1812 and 1904
Now that we have explained why the Bayou was, and is, a State-owned, navigable water body; and, that the State owns the bed, the next question is, where the low-water mark was in 1812. This is important because, the State of Louisiana, even before admission to the Union, acquired title to all lands within its boundaries below the ordinaryhigh-water mark (this changed later, as will be explained) of navigable bodies of water, along with the power to determine the rights of riparian owners.[18] As to navigable rivers and streams, the State of Louisiana holds, in its sovereign capacity, all of the land that is covered by water at its ordinary low stage, and the bank belongs to the owner of the adjacent land, *Page 7 
subject to public use; as to lakes, the State has never ceded, and still holds, the land below the ordinary high-water mark.[19] In effect, Louisiana ceded its ownership of the banks of the navigable rivers and streams when an error in interpretation occurred. According to Professor Yiannopolous,
 an error of translation crept in, however, and the word "lit" in Article 448 of the Louisiana Civil Code of 1825, corresponding with Article 457 of the 1870 Code, was translated as bank rather than bed.[20]
Louisiana courts did not rely on the French text of Article 448 of the 1825 Civil Code, despite the generally accepted rule of interpretation that when there is an error in translation the original French text controls.[21] Indeed, according to well-settled jurisprudence under the regime of the Louisiana Civil Code of 1870, the natural bank of a navigable river was the area between the ordinary low and ordinary high stage of the water.[22] The 1978 revision has codified this jurisprudence.[23]
One could argue that the erroneous translation, and subsequent codification of the jurisprudence based on that translation, is unconstitutional as it alienates sovereign lands. An analysis of that issue is beyond the scope of this opinion. *Page 8 
The low-water mark of 1812 defines the bed; and, therefore, the boundary line of ownership of the Bayou in 1812. The State's ownership of the bed of Bayou Lafourche is from the ordinary low-water mark of 1812 on one side of the Bayou, to the ordinary low-water mark of 1812 on the opposite side of the Bayou, excluding any alluvion which accumulated by natural accretion until 1904, when the dam was installed at Donaldsonville. Then, in 1904, the water level dropped because of the installation of the dam, thereby exposing a portion of the bed of the Bayou. The State owns that exposed Bayou bed in its private sovereign capacity, rather than its public sovereign capacity, and any accretion to that exposed bed as riparian owner. In addition, the State also owns the bed of the Bayou from today's low-water mark on one side to low-water mark on the other side. Absent servitudes or boundary agreements between the State and adjacent land owners, this line would be left to a court of law to decide, which would include scientific determinations by experts on the subject. Any natural accretion creates alluvion, which belongs to the riparian owner. It is possible that natural accretion did occur from 1812 until the dam was built in 1904. Therefore, in such situations, the low-water mark in 1904, immediately prior to the dam construction, would be the natural low-water mark and, arguably, the line of State ownership.
However, there was another force at work here — sedimentation. There is extensive sedimentation on the bottom of the Bayou under the water that serves to raise the level of the water in the Bayou, which, in turn, raises the low and high water marks.[24] Hence, because of the differences in the alluvion levels, the determination of the exact line of State ownership must be decided on a case by case basis.
There is another issue as to whether or not an act of man can change the law that accretion in this context belongs to the riparian owner. InEsso Standard Oil Company vs. Hunter Jones, et al. 98 So. 2d 236, (La. 1957), on reh'g., the court found that the "fact that act of mankind had something to do with change in old river channel did not prevent accretions to adjoining land along old river channel from becoming property of riparian owner." On Bayou Lafourche there have been "acts of man" performed by governmental entities as well as private land owners. These "acts of man" would not prevent the natural alluvion formed by accretion on the banks of the Bayou from being owned by the riparian owner. However, as to dirt works by people living along the Bayou, these works would have absolutely no effect on State ownership. *Page 9 
In conclusion, as stated above, the State's ownership of the bed of Bayou Lafourche is from the ordinary low-water mark of 1812 on one side of the Bayou to the ordinary low-water mark of 1812 on the opposite side of the Bayou, excluding any alluvion which accumulated by natural accretion until 1904, when the dam was installed. In addition, in 1904, the water level dropped because of the installation of the dam, thereby exposing a portion of the bed of the Bayou. The State owns that exposed Bayou bed in its private sovereign capacity, rather than its public sovereign capacity, and any alluvion caused by natural accretion to that exposed bed as riparian owner. Finally, the State also owns the bed of the Bayou from today's low-water mark on one side to low-water mark on the other side.
D. ISSUE TWO: DUTIES TO PROTECT AGAINST FLOODING, PREVENT SALTWATERINTRUSION, PREVENT POLLUTION AND "PROVIDE AND MAINTAIN" FRESH WATER
The police power of the State encompasses the exercise of its sovereign right to promote the general welfare of society, [25] including, but not limited to, the inherent right to protect citizens from damage by flood.[26] The Legislature may delegate, either expressly or implicitly, the exercise of the police power to subordinate boards, commissions, or political corporations.[27] The Lafourche Parish Police Jury is vested with responsibility for maintaining the banks of the Bayou for purposes that are incidental to the navigable character of the stream, as well as the power to maintain navigability, and may do so on the banks of navigable bayous for the purposes that are incidental to the navigable character of the stream.[28] Additionally, the Legislature has delegated several tasks to the Bayou Lafourche Fresh Water District. Among those are: 1) ensuring an adequate supply of freshwater into the Bayou; 2) preventing the intrusion of saltwater into the flow of fresh water; 3) preventing pollution; and, 4) flood prevention.[29]
The Bayou Lafourche Fresh Water District (the District), a political corporation, was created by Acts 1950, No. 113[30] for the purpose of "furnishing fresh water from the Mississippi River to the incorporated villages, towns and cities along *Page 10 
Bayou Lafourche and within or adjacent to [the District's] boundaries." The Act also charges the District with the duty "to provide and maintain in Bayou Lafourche a source of fresh water supply out of the Mississippi River from Donaldsonville to the Gulf of Mexico." By Acts 1952, No. 192, the District was authorized to construct, maintain, and operate a pumping facility at the head of Bayou Lafourche in Donaldsonville. The District operates the Donaldsonville pumping facility, constructed in 1955, and other pumping stations along the Bayou's 110-mile course, providing water for the consumption of approximately 300,000 residents. In addition to the Donaldsonville pumping facility, there are three other obstructions to the flow of the Bayou before it reaches the Gulf of Mexico."[31] It is our understanding that the District has written a letter of intent to delegate to DNR, through contract, its rights and duties to: 1) provide fresh water; 2) prevent pollution; and, 3) prevent saltwater intrusion in Bayou Lafourche to DNR.
There is one case directly on point with regard to the issue of controlling the water level in the Bayou. In this case, a riparian owner of property along Bayou Lafourche brought an action in negligence against the District, alleging property damage due to the District's actions in raising and lowering the water level in the Bayou. The Twenty Third Judicial District Court in Ascension Parish held in favor of the property owner and the First Circuit reversed for several reasons. The statements below are relevant to this inquiry and are directly on point.
 Mr. David Cloud, a registered surveyor, was accepted by the trial court as an expert in the field of land surveying. This field is defined by statute as including "the measuring of areas, land surfaces, streams, bodies of water, and swamps for correct determination and description, for the establishment, reestablishment, ascertainment, or description of land boundaries. . . ." La.R.S. 37:682 (our emphasis). Mr. Cloud testified that he surveyed the property at issue and undertook to establish the historic ordinary or "mean" high and low water stages of the bayou on the property, describing in detail the methodology required, given Bayou Lafourche's unique features. The mean high water mark shown in Mr. Cloud's survey in fact corresponded well with the "top bank" boundary set out in a 1986 survey plat of the property performed for Mr. Safford by another surveyor. Mr. *Page 11 
Cloud determined that Mr. Safford's bulkhead, boat shed, and dog pen were all situated within the ordinary or "mean" low water stage, and thus were situated on state-owned land. This testimony and supporting evidence were uncontradicted.
 As Mr. Cloud observed, the land upon which Mr. Safford's works were constructed belongs to the state, as it forms part of the bottom of a natural navigable body of water. La.C.C. Arts. 450, 456; La.R.S. 9:1101. Additionally, as Mr. Safford's property is on the shore of a navigable bayou, it is subject to any predial servitude imposed for the public utility. La.C.C. art. 665. As the District's full name connotes, its mission is to ensure the provision of fresh water for the benefit of residents within its boundaries. The evidence shows that its present mission does not relate solely to fresh water intended for human or livestock consumption, but also that needed for industrial, agricultural, and environmental purpose. As part of its mission to furnish fresh water, the District is expressly empowered to "protect from pollution the water so furnished." Acts 1950, No. 192. Clearly, Mr. Safford's individual interests in his property constructed on state land, even with the tacit or express consent of the state, must yield to the public's common interest. In short, we conclude that the District did not owe Mr. Safford any duty to maintain a certain water level within the boundaries of the water bottom owned by the state, who delegated to the District its duties pertaining to the supply of fresh water.[32]
Of particular interest and support for raising the water level, in a footnote the Court noted,
 The trial testimony established that salinity is considered a pollutant to potable water under federal Environmental Protection Agency regulations. This court further takes judicial notice of the urgent efforts to mitigate the ongoing loss of Louisiana's coast, *Page 12 
caused in part by saltwater intrusion, one of the factors weighed by the District in determining the amount of water pumped into Bayou Lafourche.[33]
As we interpret the statement of the First Circuit in Safford, the District may raise the water level in the Bayou in order to provide freshwater, prevent saltwater intrusion, and to prevent pollution in the waters of the Bayou. It is our understanding that the District is delegating these duties and rights to DNR to accomplish the freshwater diversion project envisioned by DNR.
CONCLUSION:
It is the opinion of this office that the State's ownership of the bed of Bayou Lafourche is from the ordinary low-water mark of 1812 on one side of the Bayou to the ordinary low-water mark of 1812 on the opposite side of the Bayou, excluding any alluvion which accumulated by natural accretion until 1904, when the dam was installed. In 1904, the water level dropped because of the installation of the dam, thereby exposing a portion of the bed of the Bayou. It is our opinion that the State owns that exposed Bayou bed in its private sovereign capacity, rather than its public sovereign capacity, and any alluvion caused by natural accretion to that exposed bed as riparian owner. In addition, the State also owns the bed of the Bayou from today's low-water mark on one side to low-water mark on the other side.
Further, the police power of the State, and/or its agencies, encompasses the exercise of its sovereign right to promote the general welfare of its people and society, including, but not limited to, protection from flooding, prevention of pollution, providing fresh water and prevention of saltwater intrusion. It is further our opinion that the State, and/or its agencies, may exercise these rights by controlling the water level in a State-owned water body pursuant to legislative mandates contained in, but not limited to, La.R.S. 38:3086.21, et. seq.
While we realize this opinion does not state an exact line of ownership, we trust that will be determined as between the State and the private land owners on a case by case basis, or, as a last resort, established by expert testimony in a court of law, as is evidenced inSafford. *Page 13 
We trust this adequately responds to your request. However, if our office can be of further assistance, please do not hesitate to contact us.
 Yours very truly,
 James D. "Buddy" Caldwell
 Attorney General
 BY:__________________________
 Irys L. Allgood
 Assistant Attorney General
 JDC/ILA/tp
[1] Absent boundary or servitude agreements, between the land owners along the Bayou and the State of Louisiana, the exact location of boundaries of ownership and determinations of what is accretion and exposed bayou bed, will ultimately be left to expert scientific testing and/or a court of law to decide. Although, such agreements are not a prerequisite to obtaining control of property, if it is practicable to execute them, they will be helpful in off-setting possible litigation later.
[2] We recommend consultation with the State Historic Preservation Office and the State Archaeologist in an effort to minimize the impacts to cultural resources before commencing any activities on the Bayou.
[3] EPA, "Bayou Lafourche Siphons: A Freshwater Diversion from the Mississippi River into Bayou Lafourche," p. 1 (no date).
[4] "An Analysis of Property Rights Issues Potentially Associated with the Bayou Lafourche Wetlands Restoration Project: A Report to the EPA"; Tulane Institute for Environmental Law and Policy (September 1998).
[5] Id. at page 13.
[6] La. Civil Code Art. 450.
[7] Dardar vs. Lafourche Realty Co. 985 F.2d 824 (C.A. 5 1993, on remand, 1994 WL 374309 (E.D.La. 1994), affirmed, 55 F.3d 1082 (C.A. 5 1995).
[8] Brief in Support of Proposed Improvements of Bayou Lafourche, Louisiana; Department of Public Works, LA, p. 7 (January 1947).
[9] A. N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, VOL. 2. PROPERTY, (4th ed, 2001), § 63, p. 117.
[10] See, La. Civil Code Art. 450 (1870); cf., La. Civil Code Art. 441 (1825); La. Civil Code Art. 3, p. 94 (1808). See, La. Civil Code Art. 453
(1870); La. Civil Code Art. 444 (1825); La. Civil Code Art. 6, p. 94 (1808). See also, Delacroix Corporation v. Jones-O'Brien, Inc.,597 So.2d 65 (La.App. 4 Cir. 1992), writ denied, 604 So.2d 1303 (La. 1992) (water body non-navigable in 1812; weight of the evidence).
[11] La. Civil Code Art. 450; cf., La.Const. Art. 9, § 3; In Dardar, supra, the court held that "waterways made navigable through erosion are `naturally' navigable even though the erosion is caused by increased water flow from a connecting dredged canal."
[12] La. Civil Code Art. 452.
[13] See, La. Civil Code art. 452; Smith v. Dixie Oil Co., 101 So. 24
(La. 1924); Jurisich v. Louisiana Southern Oil Gas Co., 284 So.2d 173
(La.App. 4 Cir. 1973); Southern Oyster Shell Milling Corp. v.Transcontinental Gas Pipeline Corp., 159 So.2d 542 (La.App. 1 Cir. 1963), writ refused, 161 So.2d 282 (La. 1964). See also, La.R.S. 56:424, as amended by La. Acts 1974, No. 157; La.R.S. 56:471, added by La. Acts 1979, No. 616 (clams). In T.L. James Co. v. Kenner Landing, Inc.,550 So.2d 1378 (La.App. 5 Cir. 1989), writ granted 556 So.2d 26 (La. 1990), the court declared: "Obviously, the State is the owner of the Mississippi River bottom, and, as owner, has the right, through the Department, to bring an action under La.R.S. 31:13 for damages for unauthorized removal of sand. The State as owner now may also obtain royalties and penalties through the Department under R.S. 56:2011 et seq." (550 So.2d at 1385, emphasis by the court). However, the State was not awarded damages because there was no demand for damages in the pleadings. The Louisiana Supreme Court affirmed. T.L. James Co. v.Kenner Landing, Inc., 562 So.2d 914 (La. 1990). The Department of Wildlife and Fisheries is authorized to grant leases on state-owned water bottoms for oyster cultivation, bedding, and harvesting. La.R.S. 41:1225. For mineral leases, see Sierra Club v. Louisiana Dept. of Wildlife Fisheries, 519 So.2d 836 (La.App. 4 Cir. 1988), writ denied,521 So.2d 1151, 1152 (La. 1988). For the regime of oyster leases, see also, Avenal v. State, 2003-3521 (La. 10/19/04) 886 So.2d 1085.
[14] See, La. Civil Code Art. 456(2).
[15] See, La. Civil Code Art. 456(1). Privately owned land does not become part of a navigable body of water when a nearby navigable body of water overflows its normal bed and temporarily covers the property.Edmiston v. Wood, 566 So.2d 673 (La.App. 2 Cir. 1990); Buckskin HuntingClub v. Bayard, 2003-1428 (La.App. 3 Cir. 3/3/04) 868 So.2d 266;Walker Lands v. East Carroll Police Jury, 38,376 (La.App. 2 Cir. 4/14/04) 871 So.2d 1258.
[16] La. Civil Code Art. 499.
[17] La. Civil Code Art. 499; See also, La. Atty. Gen. Op. No. 07-0030 for a complete discussion of this issue.
[18] See, A. N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, VOL. 2. PROPERTY, (4th ed, 2001), § 67, p. 119.
[19] La. Civil Code Arts. 455, 456.
[20] See Compiled Edition of the Civil Code of Louisiana, in 16 West's La. Civil Code Art. 457 (Dainow ed. 1972).
[21] Mitchell v. Bertolla, 340 So.2d 287 (La. 1976); Straus v. City ofNew Orleans, 166 La. 1035, 118 So. 125 (1928); Phelps v. Reinach, 38 La.Ann. 547 (1886).
[22] In early cases, Louisiana courts held that the bed of the river extends to the ordinary high water mark and that bank is the area above that mark. See, McKeen v. Kurfust, 10 La.Ann. 523 (1855). In this case, the court found that the public is not denied the right to deposit goods above the high water line. Cf. Perry v. Caddo Levee Dist., 132 La. 415,61 So. 511 (1913); Board of Commissioners v. Glassel, 120 La. 400,45 So. 370 (1907); Minor's Heirs v. City of New Orleans, 115 La. 301,38 So. 999 (1905). These decisions were subsequently overruled sub silentio. See, State v. Richardson, 140 La. 329, 72 So. 984 (1916);Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922); Pizanie v. Gauthreaux,173 La. 737, 138 So. 650 (1931).See also, Ballard v. Mook, 550 So.2d 1208
(La.App. 4th Cir. 1989), writ denied 556 So.2d 1283 (1990); Edmiston v.Wood, 566 So.2d 673 (La.App. 2d Cir. 1990).
[23] See, La. Civil Code art. 456. According to federal law, the state acquired the ownership of navigable water bottoms in 1812 up to the ordinary high water mark subject to a navigational servitude in favor of the public. See, Vaughn v. Vermilion Corp., 444 U.S. 206, 100 S.Ct. 399,62 L.Ed.2d 365 (1979). Doubt has been expressed as to the authority of the state, under both federal and state law, to convey the ownership of the banks of navigable rivers to private persons. See Legislative Symposium, 38 La. L.Rev. 81 (1977). But see, Phillips Petroleum Co. v.Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988), rehearing denied, 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988). See also, A. N. YIANNOPOLOUS, LOUISIANA CIVIL LAW TREATISE, VOL. 2. PROPERTY, (4th ed, 2001), § 87, p. 175 (footnotes 18-22 as in original Yiannopolous source).
[24] An Assessment of Potential Ownership Issues Associated with the Bayou Lafourche Diversion Project, George J. Castille, III; CEI, Inc., November 2001.
[25] See generally, M.J. Farms, Ltd. v. ExxonMobil Corp., et al., 2008-2371 (La. 7/1/08) — So.2d-.
[26] Board of Commissioners of Orleans Levee District v. Department ofNatural Resources, 496 So.2d 281, 289 (La. 1986).
[27] Id.
[28] See, La. Atty. Gen. Op. Nos. 02-0032 and 01-0253.
[29] See, La.R.S. 38: 3086.21, et. seq.
[30] Acts 1950, No. 113 is a local or special act of the legislature, not forming part of the published Louisiana Revised Statutes.
[31] Safford v. Bayou Lafourche Fresh Water Dist., 2003-0700 (La.App. 1 Cir. 2/23/04) 872 So.2d 1127, 1129, writ denied, 2004-0747 (La. 5/7/04) 872 So.2d 1086.
[32] Safford, supra, at 1131.
[33] Id. at footnote 5.