## No. 9578.

### N. B. PHELPS VS. ABRAHAM REINACH.

38  547
47  373

An adjudicatee may be compelled to comply with the terms of a sale when the title tendered is such as he is bound to accept.

Such adjudicatee cannot urge, as a defense, that the title offered him by the owner was made to such owner by an agent whose procuration was, at the time, revoked by the *notorious* insanity and seclusion of the principal, *unless* the mental derangement was such as would have justified interdiction, and the purchaser was aware of the incapacity.

Where the purchaser bought in good faith and paid a fair price, which enured to the benefit of the principal, and where the principal or his curator, after his interdiction, could not successfully claim the nullity of the transaction, or could not be made to take back the property, the sale will not be vitiated.

A power of attorney is revoked by the interdiction of the principal, but continues in force until the judgment to that effect has been rendered. The mandate does not expire by the *seclusion* of the principal or his confinement for treatment in an insane asylum; but it does by the *reclusion*.

The word *seclusion*, found in Article 3027 R. C. C., line 5th, should be read *reclusion*. It was introduced in the Code of 1825 by the compilers. In case of discrepancy between the French and English texts, the former prevails.

*Reclusion* means incarceration under a sentence, to undergo an infamous punishment, carrying civil degradation, in a house of forced labor.

*Seclusion* means a voluntary confinement, or retreat from social life.

Ignorance of the revocation of a power of attorney will protect an innocent third party dealing in good faith with the agent, as such.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

*A. J. Murphy* for Plaintiff and Appellant.

*E. T. Florance* for Defendant and Appellee.

The opinion of the Court was delivered by

BERMUDEZ, C. J. This is an action to compel compliance by defendant with an adjudication of real estate, made to him on February 14, 1885.

In justification of his refusal, the defendant charges that plaintiff has no valid title to the property, because, at the date of his pretended purchase, March 8, 1884, his vendor was *notoriously* insane and actually *incarcerated* in an insane asylum, to his knowledge and to that of his agent, who officiated as such in the act of sale.

The evidence shows that on August 20, 1870, E. F. Stockmeyer gave to Carl Stockmeyer his general and special power of attorney, couched in terms broad enough to sell and to cover almost every business transaction; that vested with this authority he caused the property in question to be offered for sale at public auction, and in furtherance of the adjudication made of it for $4,650, he, on the 8th of March, 1884, made title thereto to N. B. Phelps; that the latter caused the same property

to be offered for sale at auction, and that on the 14th February, 1885, it was adjudicated to the defendant for $4,625.

The record also shows, as indisputable facts, that on February 20, 1884, E. F. Stockmeyer, suffering greatly from mental excitement, was, on the advice of a physician, placed in the Louisiana Retreat, an institution in which persons mentally debilitated are taken for treatment, and that there was hope then that the said Stockmeyer would recover.

It also establishes that some seven months at least afterwards, proceedings were instituted and his interdiction pronounced 11th November, 1884.

The contention of the defendant is *double: that* E. F. Stockmeyer was notoriously insane and actually incarcerated, to the knowledge of Carl, his agent, and of Phelps, the plaintiff; *that* by his notorious insanity and subsequent interdiction, the agency was revoked and annulled.

## I.

The law applicable to a case like this is found in Articles R. C. C. 402 and 1788 (3). The former provides:

" No act, anterior to the petition for the interdiction shall be annulled, *except* where it shall be proved that the cause for such interdiction notoriously existed at the time when the acts, the validity of which is contested, were made or done; or that the party who contracted with the interdicted person could not have been deceived as to the situation of his mind.

"*Notoriously*, in this article, means that the cause of interdiction was generally known by the persons who saw and conversed with the party."

The latter article provides:

(2) "As to contracts, made prior to the application for the interdiction, they can only be invalidated by proving the incapacity to have existed at the time the contracts were made.

(3) " But, in order to prevent imposition, it is not enough to make the proof mentioned in the last rule; it must also be shown that the person interdicted was known by those who generally saw and conversed with him, to be in a state of mental derangement, or that the person who contracted with him, from that or other circumstances, was acquainted with his incapacity."

In the case of Teresa Baumgarden, curatrix, vs. Langles, which was a suit to annul a sale on the grounds of notorious insanity at the date of the sale, and of fraud on the part of a knowing purchaser buying at a price much less than the value of the thing sold, the validity of the

transaction was recognized and the purchaser quieted, although the vendor was interdicted in the fifth month after the sale.

After reviewing the law and the jurisprudence on the subject, this Court said:

"The question now in hand is, not whether Baumgarden was, to a certain extent, mentally and physically weakened by disease, but whether he was so affected to a degree rendering him incapable of validly consenting to a contract and so a fit subject for interdiction. * *

"We fully recognize the fact that a person may be mentally and physically weakened by disease without being legally incapacitated to contract, and the law extends its sheltering arms over such person to the extent of scrutinizing contracts made by them and protecting them from imposition, undue influence, improper advantage, and other fraudulent conduct by persons dealing with them." 12 Ann. 624, 652.

The Court found that a proceeding for the interdiction of Baumgarden, based on the evidence in the record as to his mental and physical condition and as to his actions and conduct prior to the date of the sale, must necessarily have failed, and held that, as there was no concealment, no misrepresentation, no threats, no improper influence, no advantage taken; as the transaction was based on a give or take offer, and was conducted openly and with the knowledge of his wife and friends, and finally executed under the supervision of his selected friend and lawyer—the sale could not be invalidated.

In the present controversy it cannot be claimed, without successful contradiction, that on March 8, 1884, E. F. Stockmeyer was a fit subject for interdiction; that his mental condition was such that he could have entered into no valid contract; that he was notoriously insane, and that Phelps knew of his condition and incapacity.

The evidence shows that it was only some eighteen days before the sale was executed that E. F. Stockmeyer was confined; that Phelps never knew him or saw him, never had any dealing with him; that he did not even inquire or ascertain whether he was purchasing from a principal or an agent.

It is also to the effect that what he was suffering from was not habitual or general insanity, but merely a mental excitement thought to be temporary, which made him, without cause, judge harshly of himself and feel so *melancholic* that he would engage in conversation with no one.

The most important testimony in the record is that of Carl Stockmeyer, produced by defendant, who says that when E. F. Stockmeyer was sent to the Retreat, no one considered him insane, not even the

physician, for up to then he was rational; that it was he who had instructed the sale; that he knew that the property was to be sold. He further states that the proceeds were placed to his credit and went to his use and benefit.

The witness also says the condition of his mind was known among his friends.

It is an important feature in this case that the price paid by Phelps was $4,650, while the amount of adjudication to the defendant Reinach was $4,625, the difference between the two being $25.

In the case of Holland vs. Miller, 12 Ann. 624, the then Court well said:

"Contracts would rest on a very weak foundation if those of the most solemn character could be avoided on allegations of insanity when the proof is contradictory.

"It would be necessary for contracting parties, before the execution of the contract, to inquire into their mutual mental soundness."

It is striking that the fact of the knowledge of the alleged insanity was deemed of vital importance by the defense, for it is formally set forth in strong terms as a foundation for resistance.

It is to be noticed that there is no charge and no proof that any undue advantage was taken, or fraud practiced, detrimental to the vendor, and that to the reverse it is proved that the price was paid to the agent and enured to the benefit of the principal.

It must also be noted that the sale was made between the second and the third week following the confinement of the patient for care and attendance in the Louisiana Retreat.

In the absence of proof of the knowledge charged and of undue advantage, or of injury, and in the presence of good faith on the part of the purchaser at least, and that the price went to the benefit of the vendor, how can the sale be invalidated?

## II.

Counsel for defendant urged in the answer that the notorious insanity and subsequent interdiction of E. F. Stockmeyer revoked and annulled the agency to Carl Stockmeyer; but in his argument he presses that the *change in the condition* and the *seclusion* of the same person has produced the same effect.

There can be no doubt that, if the mental derangement of E. F. Stockmeyer had been such as to incapacitate him from contracting and to annul contracts made by him, it would have set at nought the sale to Phelps had he been personally a factor in its transaction; but surely

·as his mental condition was not such, it cannot be claimed that it brought to an end the power of attorney given to Carl.

There can be no dispute, that the interdiction produced that effect; but of what relief can this fact be, touching the sale made by the agent between seven and eight months previous? If the judgment of inter·diction revoked, as it did, the procuration, this revocation took place only on the 13th of October, 1884, when the petition was filed, for the judgment retroacts, the power of attorney however continuing in force until then, therefore protecting the sale of March 8th, previous.

The "change in condition" invoked does not apply to a case like ·the present one. It would to that of a woman contracting marriage; to that of an agent becoming the curator of an interdicted principal; ·to that of an executor removed from office, etc. It does, however, if reference is made to the change operated by the interdiction; but, as said, this could not affect the sale of March 8th.

It cannot be insisted that the power was revoked by the simple fact of the *seclusion*, or confinement, of E. F. Stockmeyer in the Louisiana Retreat.

The word is found in Article 3027 R. C. C., and is a literal transcription from Article 2996 of the Code of 1825.

By reference to that Code, French text, it will be perceived that the word used is not *seclusion*, but *reclusion*.

It was not inserted in the Code of 1808; but was added to that of 1825, by the compilers, as appears from the "*Travaux préparatoires.*"

It is not found in the Napoleon Code, but Article 2003, which enumerates the causes for which a power of attorney is revoked, states that the procuration expires   *   *   *   by the death, natural or civil,   *   *   *   of the agent or principal.   Civil death no longer exists in France. Laurent, vol. 28, p. 87, § 80.

The two words *seclusion* and *reclusion* have quite different meaning.

The former signifies a *voluntary*, the latter an *involuntary*, confine-.ment.

*Reclusion* is a legal word, a technical expression, to which a legal signification or meaning attaches.

Legislation, jurisprudence and commentators accord, in expounding it, as being: A temporary afflictive and infamous punishment, consisting in being confined. in a hard labor institution and carrying civil degradation.   Rep. Journal du Palais, vo. Reclusion, vol. II, p. 83.

It is well settled, that when there exists a discrepancy between the ·English and French texts of the Code of 1825, the latter prevails.

Under that rule, the word *seclusion* found in Article 3027 R. C. C., 5th line, should therefore be read *reclusion*.

It is, consequently, impossible to conclude that the power of attorney was revoked by the *seclusion* of E. F. Stockmeyer.

It is a significant circumstance that Carl Stockmeyer, who was the agent and who has since become the curator of E. F. Stockmeyer, has testified establishing all the material facts required to affirm the sale to Phelps.

A critical examination of his testimony shows that whatever the knowledge be which he had of the condition of the mind of his principal, he never supposed that the mental excitement from which he was suffering could operate or had operated a revocation of his powers, and that he continued to exercise them in his dealing with one who was like him, and more than he, in perfect good faith.

The law in such a case wisely provides, that if the attorney, in ignorance of the cessation of the rights of his principal, continue under his power, the transactions done by him are valid and must be carried out in favor of third persons acting in good faith.   R. C. C. 3032–3.

Were it not so, exclaims Troplong while commenting on the corresponding French article, what would become of the security of transactions, the rights to credit, the respect due to good faith, that civil and commercial equity, so much praised by Ansaldus, Straccha, after Paul and Ulpian ?  Troplong, Mandat No. 824, p. 729; see also, Laurent, vol. 28, No. 115, p. 122; also Bandry Lacantinerie, vol. 3, No. 939, § 3.

Under the law and the circumstances, we do not feel authorized to justify the grounds of resistance and to forever block up in the hands of the plaintiff property to which he has acquired a valid title, of which E. F. Stockmeyer himself could not divest him and which he could not be made to take back.  On the contrary, we feel bound to recognize the reality of plaintiff's title and to enforce the adjudication of the property to the defendant.

It is therefore ordered and decreed that the judgment appealed from be reversed; and it is now ordered and decreed that the defendant be commanded to comply with the adjudication made to him on the 14th. of February, 1885, of the property described in the petition, on petitioner furnishing him a title free from all encumbrance, save such as he was to assume; said purchaser to pay the cash then demanded and which has since become due; and that in default of such compliance within fifteen days after this judgment shall have become final and the title tendered, plaintiff recover from defendant the following sums:

1st.  Two thousand three hundred and twelve dollars and fifty cents. ($2,312.50), with legal interest from judicial demand till paid;

2d. Seven hundred and seventy-five dollars ($775), with seven per cent from 14th February, 1885, till paid;

3d. A similar sum ($775) with similar interest from same date till payment;

4th. Eight hundred and twelve dollars and fifty cents ($812.50), with eight per cent interest per annum from said February 14, 1885, till paid; Over and above the taxes due and exigible in 1885; the plaintiff to receive the above two amounts of $775 each, or $1,500 both, only on production of the two notes which the purchaser was to have assumed; the defendant to pay costs in both courts; the whole amount, in capital and interest, to be secured by vendor's lien on the real estate adjudicated and described in the partition.