**(118 So. 125)**

No. 28199.

**STRAUS v. CITY OF NEW ORLEANS.**

July 2, 1928.

or belonging, * * * machinery, boilers, dynamos, mechanical equipment, including belting, shafting, conveyors, and fixtures, and all other machinery and equipment of every kind, nature and description, whether attached to said premises or placed therein, and apparatus of any, all and every kind and character whatsoever," etc. The language, therefore, left no doubt that the mortgagor intended to include and did include in the act of mortgage everything in the way of machinery and apparatus in the cotton mills, equipped as going concerns.

On the 1st day of January, 1924, the corporation had become insolvent, ceased operations, and abandoned its property, including the New Orleans mill, to the trustee for the bondholders. He foreclosed the mortgage on the property in Mississippi, and afterwards on the New Orleans property, and after applying the proceeds to the mortgage bonds there was a deficit of more than $100,000.

In November, 1925, a short time before instituting the foreclosure proceedings on the New Orleans property, the trustee for the bondholders, with the consent of the corporation, sold all of the machinery in the New Orleans cotton mill to a concern in Houston, Tex., for $53,000, which was applied on the mortgage debt. That sum is included in the calculation showing the loss of more than $100,000 by the bondholders.

Before any of the machinery was dismantled for shipment to Houston, and while the mill remained intact and ready to operate as a cotton mill, the state tax collector seized the machinery, claiming a tax lien on it, as personal property, for unpaid taxes for 1924, assessed against other property, which was in fact personal property, belonging to the Magnolia Textile Corporation at the time of the assessment. The seizure was levied about the 1st of August, 1925, and the dismantling of the machinery commenced on the 1st of November, that year. After the machinery was

Monroe & Lemann and Walter J. Suthon, Jr., all of New Orleans, for appellant.

Bertrand I. Cahn, City Atty., and Francis P. Burns, Asst. City Atty., both of New Orleans (Rene A. Viosca, of New Orleans, of counsel), for appellee.

O'NIELL, C. J. The Magnolia Textile Corporation owned and operated a cotton mill in New Orleans, and cotton mills in Mississippi. In November, 1921, the corporation mortgaged its cotton mills to Simon J. Straus, trustee, to secure a bond issue of $275,000. The description of the lands on which the mills were situated included "all buildings, improvements and appurtenances thereunto attached

dismantled, boxed, crated and prepared for shipment, the city of New Orleans seized it, claiming a tax lien on it, as personal property, for unpaid taxes for 1924 assessed against the other property, being the personal property belonging to the Magnolia Textile Corporation at the time of the assessment.

Apart from the assessment of its real estate for the taxes of 1924, the Magnolia Textile Corporation was assessed for taxes on the following items as "personal property," viz.: Merchandise, $75,000; office furniture, $1,000; machinery, $46,800; miscellaneous, or other articles of value, $11,400.

The trustee for the bondholders paid the taxes for 1924 on the real estate, and paid the taxes on the "machinery," assessed at $46,-800; the amount of taxes due the city on the machinery being $1,093.95. The payment was made for account of the bondholders, with subrogation to the tax lien. The taxes on the personal property of the corporation, described as merchandise, assessed at $75,000, office furniture, assessed at $1,000, and miscellaneous or other articles of value, assessed at $11,400, for the year 1924, were not paid; and those articles were disposed of by the corporation, or could not be found or levied upon by the tax collector.

The trustee brought this suit against the city, and a similar suit against the state tax collector, and obtained writs of injunction against the enforcement of a tax lien upon the machinery, for delinquent taxes assessed against the other and personal property of the tax debtor. The plaintiff claims that the machinery in the cotton mill was immovable by destination, and was therefore affected by the bond mortgage, and not subject to a tax lien to secure the payment of taxes assessed against other property, or personal property, of the tax debtor. The injunction bond in each case being ample security for the taxes claimed, the trustee was allowed to ship the machinery to Houston pursuant to the sale which had been made when the machinery formed part of the cotton mill.

The defendant in each suit contended that the machinery in the cotton mill was personal property, not subject to the mortgage on the real estate, but subject to a tax lien to secure the taxes assessed against any and all of the personal property of the tax debtor, and the city pleaded also that, if the machinery was not personal or movable property while in place as a part of the cotton mill, it became personal or movable property when it was dismantled, and before the city levied its seizure. The city pleaded, as an estoppel, that the trustee, by paying the taxes for 1924, on the machinery, assessed as personal property, recognized that the machinery was properly classed as personal property; and the city pleaded, also by way of estoppel, that the corporation, through W. H. Purvis, its office manager, had made a return of the corporation's property for assessment for the taxes of 1925 and listed the machinery under the head of "Personal Property," and thereby recognized that the machinery was properly classed as personal property, and that he afterwards asked for and obtained a reduction of the assessment on the machinery, as personal property, for the taxes of 1925, and thereby again recognized that the machinery was properly listed as personal property.

The civil district court gave judgment in favor of the defendant in each case, dissolving the writ of injunction and condemning the plaintiff to pay the taxes for 1924 assessed against the personal property of the corporation, with interest, attorney's fees and costs. The amount of the judgment in favor of the city is $2,042.98, plus the interest and attorney's fee. This appeal is from that judgment. The amount of the judgment rendered in the other suit, for the state taxes, was less than $2,000. The appeal in that case, therefore, was taken to the Court of Appeal, where it is now pending.

The district judge has given his opinion in writing, in which he construes article 468 of the Civil Code to mean that the machinery forming part of a manufacturing establishment in a city is not like the "things which the owner of a tract of land has placed upon it for its service and improvement," and is not "immovable by destination," unless it is "permanently attached to the tenement or to the building," or unless the owner of the manufacturing establishment has complied with section 1 of Act 30 of 1904, p. 37, as amended by Act 187 of the same session, p. 419, by filing in the office of the register of conveyances and in the office of the recorder of mortgages a declaration that the real estate and machinery are to be considered and dealt with as a whole and that the machinery is to be considered as part and parcel of the real estate. No such declaration was filed by the Magnolia Textile Corporation, as owner of the cotton mill described in the act of mortgage.

The tax lien claimed by the city, on this machinery, is not for the taxes that were levied or assessed upon the machinery, but for the taxes that were levied and assessed upon the other property, conceded to be the personal property of the tax debtor. The taxes levied and assessed upon the machinery, as well as the taxes levied and assessed upon the land and the building in which the machinery was, were paid, as we have said, before the machinery was seized by the tax collector, and before it was sold to the concern in Houston.

The tax-collecting authorities may seize and enforce a lien upon any personal or movable property of the tax debtor for the collection of taxes levied and assessed upon any other personal or movable property belonging to him. Const. art. 10, § 11, par. 2 (which was article 233, par. 2, of the Constitution of 1898); Cleveland Steel Co. v. Joe Kaufman Co., 155 La. 529, 99 So. 428. But the immovable property of a tax debtor is not subject to seizure for taxes levied against his personal or movable property. Mullan v. His Creditors, 39 La. Ann. 397, 2 So. 45; Saloy v. Woods, 40 La. Ann. 585, 4 So. 209.

The question, therefore, is whether the machinery in the cotton mill was immovable by destination, and therefore a part of the real estate. For the purpose of assessment for taxes, section 91 of Act 170 of 1898, which was then and is yet the current revenue law, at page 386, provides:

"Sec. 91. Be it further enacted, etc., that the following rules for the taxation of persons and property are hereby established, to-wit:

"1. The term 'real estate' shall be held to mean and include not only land, city, town and village lots, but all things thereunto pertaining, and all structures and other things so annexed and attached thereto, as to pass to the vendee by the conveyance of the land or lot.

"2. The phrase 'personal property,' or 'movable property,' shall be held to mean and include all things other than real estate, which have any pecuniary value, and moneys, credits, investments in bonds, stocks, shares in joint-stock companies or otherwise."

According to those definitions, laid down especially for the classification of property, either as real estate or as personal or movable property, for the purpose of assessment for taxes, the machinery in and forming part of a manufacturing establishment is real estate. In Marston v. Elliott, 138 La. 580, 70 So. 521, the court, after quoting paragraph 1 of section 91 of Act 170 of 1898, at page 386, said:

"So that, in assessing real estate, it was the duty of the assessor in this instance to include, not only the land, but all things appertaining thereto."

The judgment appealed from cannot be reconciled with the decision rendered in Bank of Lecompte v. Lecompte Cotton Oil Co., 125 La. 844, 51 So. 1010, construing, in connection with article 468 of the Civil Code, the Act 30 of 1904, as amended by Act 187 of the same year. Act 187 is merely an amendment and re-

enactment of the first section of the Act 30 of 1904. There is therefore only one statute, of that year, on the subject, which is Act 30— the first section of which must be read as amended and reproduced by the Act 187 of 1904. The act provides that, whenever the owner (whether a person or partnership or corporation) of any real estate on which is located any manufacturing or industrial establishment, who is also the owner of the machinery and appliances used in the establishment, shall file in the office of the register of conveyances and in the office of the recorder of mortgages for the parish in which the real estate is situated a declaration setting forth that such real estate and such machinery and appliances (referring to them in general terms and not necessarily by detailed inventory) are to be considered and dealt with as a whole and that such machinery and appliances are to be considered as part and parcel of such real estate, then all such machinery and appliances, and all renewals thereof and additions thereto, shall be and become immovable by destination and shall form and constitute part and parcel of such real estate for purposes of mortgage and sale only. The words "for purposes of mortgage and sale only" were added to section 1 of the Act 30 by the Act 187 of 1904. That is the only amendment that was made by the Act 187. The second section of the act declares that the expression "manufacturing or industrial establishment" shall embrace and include any and all mills, factories, manufactories, chemical works, foundries, machine shops, repair shops, distilleries, and establishments for printing, or publishing, or bookbinding, or woodworking, or making, manufacturing or compounding any article or substance used in trade or commerce, and that the words "machinery and appliances" shall include and embrace any and all boilers, engines, motors, shafting, wiring, fixtures, machines, presses, type, tools, rollers, filters, mixers, retorts, de-

vices, apparatus and appurtenances of every kind and character used in such establishments. The third and last section merely repeals all laws and parts of laws in conflict with, or contrary to, or inconsistent with the provisions of the act.

It is, of course, a matter of conjecture as to why the first section of the statute was amended at the same session in which it was originally enacted, by the addition of the qualifying phrase, "for purposes of mortgage and sale only." But it is quite likely that the purpose was—for it is plain that the effect was—to leave in force the provision in section 91 of Act 170 of 1898, p. 386, that *for purposes of taxation and assessment*, the term "real estate" should be held to mean and include not only lands, and city, town and village lots, but all things thereunto pertaining, and all structures and other things so annexed or attached thereto as to pass to the vendee by a conveyance of the land or lot. The purpose of the amendment, perhaps, was that, for purposes of taxation and assessment, there should be no necessity for filing in the office of the register of conveyances or in the office of the recorder of mortgages any such declaration as was required by the Act 30 of 1904, to make the "machinery and appliances" in a "manufacturing or industrial establishment" form part of the "real estate."

In the case of Bank of Lecompte v. Lecompte Cotton Oil Co., supra, the bank instituted foreclosure proceedings on a mortgage on the defendant's cotton oil mill and the land on which it was situated. Two other creditors seized the machinery in the mill under writs of attachment, and another creditor, having a judgment against the defendant, cotton oil company, seized the machinery under a writ of fieri facias; and the three seizing creditors afterwards filed interventions and oppositions in the bank's foreclosure proceeding, and contended that the bank had no mortgage on the machinery in the cot-

ton mill because, as the cotton oil company had not filed in the office of the register of conveyances or the recorder of mortgages the declaration required by the Act 30 of 1904, as amended by the Act 187 of that year, the "machinery and appliances" in the "manufacturing or industrial establishment" did not "become immovable by destination," or "form and constitute part and parcel of such real estate for purposes of mortgage and sale only." But the court held that, under article 468 of the Civil Code, the machinery in the cotton oil mill was immovable by destination, and that the statutes of 1904 did not repeal or in any way modify the article of the Civil Code, but merely provided a method by which, in any doubtful case, it might be made certain and made a matter of record that the machinery and appliances in any particular manufacturing or industrial establishment should be dealt with as immovable by destination and as forming part and parcel of the real estate, for purposes of sale and mortgage. Chief Justice Breaux, speaking of the machinery, for the court, said:

"The law-making power made it immovable before the new act, and the same power made it immovable under the terms of the latter act. * * *

"The declaration makes it possible for the owner to immobilize property where immobilization is not certain.

"The usefulness of the act is evident in mortgaging a foundry, a printing establishment, consisting of different parts, in regard to which it is at times difficult to make an accurate list. The declaration includes them all, even though the list is general. * * *

"The Act of 1904, No. 187, does not have the far-reaching effect of repealing all laws relating to movables [meaning immovables] by destination. Under the old law [meaning article 468 of the Civil Code] all property attached to or forming part of the immovable is immovable.

"But if, on the contrary, the statute in question has the effect of repealing all laws upon that subject-matter, then in this case the boilers inclosed in the immovable are movables.

"There is no logical justification possible for such a conclusion.

"Evidently it was the legislative intention to enable the debtor to mortgage his factory and accessories as one plant. Unless the statute of 1904 is complied with, the property is not primarily considered as having been mortgaged in its entirety. It does not form one body. In case of necessity the creditor must prove that the property was immovable by destination. If there is a declaration, the onus is not upon him of proving what property is mortgaged. * * *

"To hold otherwise, we would have to hold that even the boilers, attached to and made part of the realty, are not part of the property mortgaged, although as much part of the land as the land itself."

That decision established a rule of property, over 18 years ago; and it is only fair to assume that investors who have bought or taken mortgages upon manufacturing or industrial establishments in this state, including the bondholders represented by the trustee in this case, acted upon the faith of the construction which this court put upon the Act 30 and the Act 187 of 1904, in the decision quoted. If we doubted the correctness of that construction now, we would not change it, so as to impair the obligations of contracts presumed to have been made on the faith of it. Southern Grocer Co. v. Adams, 112 La. 60, 36 So. 226; Maxwell-Yerger Co. v. Rogan, 125 La. 1, 51 So. 48. The Supreme Court of the United States treats the construction which the highest court of a state has given to a statute of the state as a part of the statute itself; and if different constructions are given to the same statute at different times, it will not follow the latest decision if thereby contract rights which have arisen under the earlier ruling would be injuriously affected. Douglass v. Pike County, 101 U. S. (11 Otto) 677, 25 L. Ed. 968.

The ruling in Bank of Lecompte v. Lecompte Cotton Oil Co. was in accord with the decisions rendered previous to the statutes of 1904; for the earlier decisions maintain that the declaration in article 468 of the Civil Code, that "things which the owner of

a tract of land has placed upon it for its service and improvement, are immovable by destination," is applicable to the machinery which the owner of an urban manufacturing establishment has placed in it for its service and improvement, as well as to things which the owner of a farm or other predial estate has placed upon it for its service and improvement.

In Maginnis v. Union Oil Co., 47 La. Ann. 1489, 18 So. 459, the question was whether the machinery in the manufacturing establishment known as Maginnis Oil & Soap Works, in New Orleans, was conveyed by a nonjudicial auction sale of the land "with all the buildings and improvements thereon, and all rights, ways, privileges and appurtenances thereunto belonging." The ruling was that the machinery was immovable by destination and was conveyed by the sale of the land and building. Chief Justice Nicholls, for the court, said:

"Looking at the building at the date of the sale, without reference to the advertisement, we are of the opinion that the machinery at that time formed part of the real estate as immovable by destination. It was placed upon the property by its owner for its service and improvement, and had been so used. C. C. arts. 468, 469. And, though for special reasons, subsequent owners may have discontinued this use, for a certain time, it has never been dismantled. A mere intention of dismantling remaining unexecuted up to the time that third persons acquired ownership of the property in its actually existing condition, would produce no effect as against such person.

* * * * * * *

"Holding as we do that the machinery was, at the date of the sale, immovable by destination, we think the absence of words of reservation and exclusion in the advertisement, it passed to the purchaser of the real estate, as part thereof, and that the judgment of the district court to that effect was correct."

In New Orleans Canal & Banking Co. v. Leeds & Co., 49 La. Ann. 123, 21 So. 168, the liquidators of the insolvent Leeds & Co. disputed that the machinery and appliances in the Leeds Foundry, in New Orleans, were im-

movable by destination, or included in the bank's mortgage on the land, with the buildings and improvements thereon. The court ruled that the machinery and appliances in the foundry were immovable by destination and therefore subject to the bank's mortgage, saying:

"The first question which this case presents is whether the 'movables' were part of the foundry, and immovable by destination, and, as such, subject to plaintiff's mortgage.

"The tools, lathes, and machines, forming part of a foundry, and used in its works, become immovable by destination. These improvements in the Leeds foundry in so far as they were needful to the operation of the foundry, were permanently attached to the realty, and rested upon brick and mortar. At the time that the Civil Code was adopted, interests in manufacturing industries were quite limited. The article of the Civil Code, 458 [meaning 468], is, in consequence, not as large and full upon that point as it is in regard to agricultural immovableness. At this time the conditions of the two do not greatly differ. The movables permanently attached to factories, if the factory itself is immovable, become immovable by destination, in the same manner that things which the owner of a tract of land has placed upon it for its service and improvement are immovable by destination. Civ. Code, art. 468."

■ .The decisions which we have quoted are sustained by the language of article 468 of the Civil Code, and by reference to its origin in the French Code, and the meaning which the commentators gave it. The theory and basis of the judgment appealed from is that only those movable articles which the owner of a *tract of land*, or predial estate, has placed upon it for its service and improvement become immovable by destination, under article 468 of the Code, and that the movable articles which the owner of an urban manufacturing establishment has placed in it for its service and improvement do not become immovable by destination unless they are attached to the premises permanently, as with plaster or mortar, or so that they "cannot be taken off without being broken or injured, or without breaking or injuring the

part of the building to which they are attached"—as expressed in article 469. It is true that the first paragraph of article 468 declares merely that "things which the owner of a tract of land has placed upon it for its service and improvement, are immovable by destination"—which, unexplained, might not include things which the owner of a manufacturing establishment has placed in it for its service and improvement; but the illustrations given in the subsequent paragraphs are made up of two distinct classes of things which thus become immovable by destination, viz: (1) Those which are used in the cultivation and exploitation of lands; and (2) those which are used in the operation of manufacturing establishments, such as cotton mills, sawmills, taffia or rum distilleries, sugar refineries, "and other manufactures." The English translation of the illustrations of the things that become immovable by destination by being placed in a manufacturing establishment by its owner, for its service and improvement, reads:

"The utensils necessary for working cotton, sawmills, taffia distilleries, sugar refineries and other manufactures."

The French text of the corresponding article (459) of the Code of 1825 leaves no doubt that the illustrations refer to cotton mills, sawmills, etc., viz.:

"Les ustensiles nécessaires à l'exploitation des moulins à cotton, à scie, guildives, refineries, et autres manufactures."

There were, of course, very few manufacturing or industrial establishments in Louisiana when the Code was adopted. That is why the specific illustrations given of the things that became immovable by being placed in a manufacturing or industrial establishment were only those which were thought of as appropriate at that time. That was true also in France when the Code Civil was adopted. Hence the illustrations that were given of the things that became immov-

able by being placed in a manufacturing or industrial plant were only such as were then appropriate in France, viz: "Les ustensiles nécessaires à l'exploitation des forges, papeteries et autres usines"—the utensils necessary for the operation of forges, paper factories, and other works. In all other respects—except for the illustrations given—article 524 of the French Code was copied literally in the French text of article 459 of the Louisiana Code of 1825, which became article 468 in the revision of 1870. In the French text of the Louisiana Code, as in the Code Napoléon, the word which was translated into "a tract of land," in the Louisiana Code is the French word "fonds." According to the opinion of Judge Parlange, in Morton Trust Co. v. American Salt Co. (C. C.) 149 F. 540, this French word, "fonds," from the Latin "fundus," has no exact synonym in English. According to Spiers' & Surenne's Dictionary, the meaning of "fonds" is not confined to *land*, or *ground*, but may mean landed property, which according to Webster, means *real estate*, including buildings on the land. The compilers of the Louisiana Code of 1825, in speaking of the movable effects that became immovable by being affixed permanently to an immovable, as with plaster or cement, used the French word "fonds" somewhat indifferently—sometimes as meaning land only, and sometimes as meaning real estate, consisting of either land or a building. In copying the last paragraph of article 524 of the French Code, where the word "fonds" alone is used to describe the real estate, in the declaration that all of the movable effects which the proprietor has attached permanently to the real estate "fonds" are likewise immovable by destination, the redactors of the Louisiana Code added the words, "ou au batiment"—meaning "or to the building." A literal translation of that paragraph of article 459 of the Louisiana Code, therefore, is that all of the movable ef-

fects which the proprietor has attached permanently to the land or building are likewise immovable by destination; but, strange to say, in their translation of it into English, the redactors translated the word "fonds" as meaning *tenement*. The translation, therefore, reads:

"All such movables as the owner has attached permanently to the tenement or to the building are likewise immovable by destination."

The word "tenement," according to Webster, means generally any kind of real estate, but specifically a *dwelling house*. The French word "fonds" was construed with the same indifference in adopting article 525 of the French Code, as article 460 of the Louisiana Code of 1825, which (in the translation) declares that the proprietor is presumed to have attached permanently to his tenement or building such movables as are affixed to the same with plaster or mortar, or such as cannot be taken off without being broken or injured, or without breaking or injuring the part of the building to which they are attached. Where the word "fonds," alone, is used in the French Code, the words "fonds ou batiment" (land or building) are used in the Code of 1825, and the words "tenement or building" are used in the translation, and, again, where the word "fonds," alone, is used in the French Code, the words "du batiment ou du fonds" are used in the Code of 1825, and the word "building," alone, is used in the translation.

Article 459 of the Code of 1825 appeared as article 20 in chapter 2 of title 1 of book 2 of the Act of March 31, 1808, called the "Digest of the Civil Laws in Force in the Territory," referred to as the Civil Code of 1808. The French version of those articles of which the original translation is retained in the Revised Civil Code are as authoritative as the corresponding articles of the Revised Civil Code. In fact the advantage of having access to both the French and English versions was pointed out in section 3 of chapter 29 of the Act of March 31, 1808, adopting the Digest, viz.:

"That if in any of the dispositions contained in the said digest there should be found any obscurity or ambiguity, fault or omission, both the English and French texts shall be consulted, and shall mutually serve to the interpretation of one and the other."

For the same purpose, it was provided in section 2 of the Act of April 12, 1824, p. 172, providing for the adoption and promulgation of the Code of 1825, that the English and the French version of each article should be printed opposite one another.

Chretien v. Theard, 2 Mart. (N. S.) 582, decided in June, 1824, was a redhibitory action to annul the sale of a slave which the plaintiff had bought, on the ground that the slave was a thief. The French text of the Code, or Digest, gave a purchaser the right to revoke the sale of a slave addicted to *theft*— "*si l'esclave est addonné au vol*"—which was translated in the English text, "if he is addicted to robbery." The ruling was that the French word "vol," having a broader meaning than "robbery," should prevail. The court said:

" 'Vol' is the generic term in the French language, for theft of every kind, and, it is admitted, embraces larceny. Robbery, it is said, means the offense known to our criminal law as such. And it is urged that the English version shows that the word 'vol' in the French was used in the restricted sense of taking the property of another by force.

"Our Code was passed previous to the enactment of the Constitution, and the Legislature, in adopting it, directed that the French and English texts must be taken together, and that they should mutually serve for the interpretation of each other. 2 Mart. Dig. 98.

"Whenever therefore the expressions can be reconciled, and made to harmonize with each other, it is the duty of those on whom the task of construing them is devolved, to do so. When they cannot, such a construction must be adopted as does violence to neither, and gives effect to both. * * *

"And where they are not entirely different, as in the case before us, where the word in one

text includes the meaning used in the other, and means something more, we must, on the same principle, take that which presents the most enlarged sense, because in doing so we give full effect to both clauses."

Accordingly, inasmuch as the word "fonds," in the French text of article 459 of the Code of 1825, includes the meaning of— and means something more than—the phrase, "a tract of land," in article 468 of the Revised Civil Code, we must adopt the most enlarged meaning or sense, because in doing so we give full effect to both articles.

In Durnford v. Clark's Estate, 3 La. 199, in 1831, it was observed that the English version of article 3429 (now 3466) of the Code, allowing creditors and other persons having an interest the right to plead prescription, referred only to the prescription acquirendi causa, whereas the French text referred to the prescription either acquirendi or liberandi causa; and, the question being which text should prevail, the court ruled in favor of the French text.

In Beaulieu v. Ternoir, 5 La. Ann. 476, in 1850, the court rejected the English translation of the definition of *substitutions*, in article 1507 (now 1520) of the Code, and adopted the French text, saying:

"Article 1507 of the Code, which defines substitutions, was transcribed without change from the Code of 1808, and the French text evidently expresses the intention of the Legislature. The English text, taken literally, is without meaning."

In Phelps v. Reinach, 38 La. Ann. 547, it was said to be well settled that where there was a discrepancy between the English and French texts of the Code of 1825 the French text should prevail. Accordingly, it was held, and was repeated in Jurgens v. Ittman, 47 La. Ann. 373, 16 So. 952, that the word *reclusion*, in the French text, should be substituted for the word *seclusion*, in the English text, in article 3027 of the Code.

Article 2236 of the Revised Civil Code declares that an authentic act is full proof of the agreement contained in it, *against* the contracting parties and their heirs or assigns, unless it be declared and proved a forgery. The French text of the corresponding article (2233) of the Code of 1825 declared that an authentic act was full proof of the agreement contained in it, *between* the contracting parties, etc. In Commercial Germania Trust & Savings Bank v. White, 145 La. 54, 81 So. 753, it was held that the rule of evidence was applicable only to suits *between* the contracting parties. Chief Justice Provosty, for the court, said:

"By the expression 'against the contracting parties' the latter article [2236] means 'between the contracting parties.' This is shown by the text of the Code Napoléon from which said article was taken verbatim, and also by the French text of the Code of 1825, where the word used is 'entre,' the English equivalent of which is 'between.'"

Adverting again to article 468 of the Code, it is plain that, inasmuch as the word "fonds" was used in the corresponding article (459) of the French text of the Code of 1825, as well as in the corresponding article (524) of the Code Napoléon, the opinions of the French commentators, on article 524 of the Code Napoléon, are as appropriate to article 468 of the Revised Civil Code of Louisiana as they are to the article of the Code Napoléon, notwithstanding the words "a tract of land" were substituted for the word "fonds," in the translation of article 459 of the Code of 1825, and in article 468 of the Revised Civil Code.

Baudry-Lacantinerie, in his Theory and Practice of the Civil Law (2d Ed.) vol. 5, p. 55, No. 57 and No. 74, declares that movables become immovable by destination as well by being placed in a manufacturing or industrial establishment as by being placed upon a farm for its service and improvement. He explains that the illustrations, consisting of "the utensils necessary for the working of

forges, paper mills, and other manufactories," refer to *immobilization by an industrial destination;* that the reason why the provisions of the law on that subject were so brief was that, at the time when the Code was written, the manufacturing industry was yet in its infancy; that the conditions required for an industrial immobilization are the same as for an agricultural immobilization; that there should be an immovable industrial establishment, or fundus, consisting usually of buildings, constructed and made fit especially for industrial use, and to which are attached machines, utensils, and equipment intended for the operation of the fundus; and, finally, that these machines, utensils and equipment must be necessary for the operation of the industrial fundus.

Planiol and Ripert, in their Practical Treatise on the French Civil Law, vol. 3, pp. 82 and 86, point out that article 524 of the Code Napoléon gives specific illustrations of things that are immobilized by being placed upon a predial estate and gives other specific illustrations of things that become immovable by being placed in a manufacturing or industrial establishment for its service or improvement.

Marcade, vol. II, p. 399, says that, since a construction inherent in the soil is immovable by nature, it is necessarily so in all of its parts, and that, thus, the immobility of the building renders immovable the mill, not fastened by pillars, which forms part of that building.

Duranton, vol. 2, p. 51, declares that the same rule is applicable to the machinery and appliances in a manufacturing establishment that is applicable to the agricultural implements on a farm; that is to say, that the ease with which they may be taken away does not prevent their being immovable by destination.

Laurent, vol. 5, p. 537, says that the owner immobilizes the things which he places on either an agricultural or an industrial fundus,

for its service and exploitation. And, on page 564, the author says that, in the illustrations in article 524—the utensils necessary for working forges, paper mills and other manufactories—the word "manufactories" should be interpreted most liberally, for it applies to every industrial establishment where the buildings are especially constructed and adapted for carrying on the industry, and that the interest of the industry demands that such utensils as are used in the establishment should not be detached from it.

Fuzier-Herman, vol. 8, p. 11, declares that the immobilization provided for by articles 522 and 524 is either agricultural or industrial, depending on whether the things immobilized are appropriated to an agricultural or to an industrial fundus, and (page 13) that the enunciations of article 524 are made in very limited terms because of the comparatively small progress which industry had made at the time when the Code was written, and that, therefore, the generic term "manufactories" employed by the Legislature should embrace not only industrial establishments functioning by means of natural or artificial power, but also all fabricating or manufacturing work-benches in the establishments set apart to the industry to which they belong.

Our conclusion is that the machinery in the cotton mill of the Magnolia Textile Corporation was immovable by destination, and was therefore subject to the mortgage in favor of the bondholders, and not subject to a tax lien for the taxes levied against the personal or movable property of the corporation.

■ The dismantling of the machinery, in order to ship it, pursuant to the sale which was made with the consent of the mortgagor while the machinery was subject to the mortgage, did not release the machinery from the mortgage or subject it to a tax lien for the taxes which had been assessed against the personal property for the year before. The

selling, dismantling and shipping of the machinery, in order to apply the proceeds to the mortgage debt, was a legal method of enforcing the mortgage to the extent of the value of the machinery. New York Life Insurance Co. v. Hymel, 164 La. 103, 113 So. 782. The doctrine which protects one who, in good faith, buys machinery from the mortgagor after it has been severed from the mortgaged premises, has no application to a case like this, where the machinery, while subject to the mortgage, was virtually turned over to the mortgagee in part payment of his debt. Weil v. Lapeyre, 38 La. Ann. 303.

██ Referring to the city's plea of estoppel it appears that, on the assessment rolls for the year 1924, the figures representing the value of the machinery, $46,800, were placed in the column bearing the printed heading "Machinery," on the personal property rolls, and not on the real estate rolls. The trustee for the bondholders paid the taxes so assessed, and received a receipt on a printed form, bearing the caption "On Personal Property." The trustee was not in any way responsible for the fact that the assessor listed the machinery on the personal property rolls instead of listing it on the real estate rolls, where it belonged. The receipt which the trustee received, being on the printed form furnished by the tax-collecting authorities, was the only form of receipt that the taxpayer could obtain. There was, therefore, no acknowledgment on his part that the machinery was properly listed as movable property, and no estoppel, in the act of paying the taxes and receiving the receipt. The purpose of the trustee in paying the taxes on the machinery and on the manufacturing establishment to which it was attached was to protect the mortgage of the bondholders against the prior tax lien; and the fact that the trustee paid the taxes only on the real estate, including the machinery, and did not pay it on the property which was in fact personal property, leaves the inference that the trustee regarded the machinery as a part of the real estate, and therefore subject to the bondholders' mortgage.

██ Aside from that view, the doctrine of estoppel is applicable only to acknowledgments of matters of fact, not to acknowledgments or statements of propositions of law. It is true that W. H. Purvis, office manager for the Magnolia Textile Corporation, made a return of the corporation's property for the taxes of 1925, on which he listed the machinery as personal property; and it is true that he afterwards applied for and obtained a reduction of the assessment on the machinery. But the printed form on which the return was made, as well as the printed form of application for a reduction, was furnished by the assessing authorities, with the printed classification "All Machinery, etc." That was the only heading under which the taxpayer could list the machinery. Those acts on the part of the taxpayer had reference to the taxes of 1925, not the taxes of 1924, which are in dispute; and the acts were those of the taxpayer, not of the bondholders. The taxpayer could not by any act done subsequent to the granting of the mortgage impair the rights of the bondholders, as mortgagees. The defendant's pleas of estoppel are not well founded.

The judgment appealed from is annulled and the writ of injunction perpetuated. The defendant is to pay all costs of this suit.