### UNITED STATES v. HARANG.
### No. 11945.

Circuit Court of Appeals, Fifth Circuit.

Dec. 30, 1947.

Rehearing Denied Feb. 11, 1948.

Hilbert P. Zarky, and Sewall Key, Sp. Assts. to the Atty. Gen., and Herbert W. Christenberry, U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., both of New Orleans, La., for appellant.

Arthur A. Moreno, of New Orleans, La., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

LEE, Circuit Judge.

The question presented by this case is whether oil royalties received during the years 1937, 1938, 1939, and 1940, by the taxpayer from his separate property constituted community income or his separate income. The facts were stipulated and found by the district court in accordance with the stipulation.

The taxpayer resides in Louisiana and was married prior to the tax years; during those years a community of acquets and gains existed between him and his wife. He owns, as his separate property, an undivided ¼ interest in producing oil lands in Louisiana, a ⅛ interest having been inherited from his father and a ⅛ interest having been the gift of his mother. During the tax years, he received certain royalty and over-riding royalty from his interest in these lands. Treating these royalties as income belonging to the community, the taxpayer reported in his tax returns only one half of the amounts which he had received. The Commissioner determined deficiencies for the years 1937 through 1940 on the ground that the royalties were the separate property of the taxpayer and should have been included in their entirety in his taxable income. The taxpayer paid the deficiencies and, claims for refund having been rejected by the Commissioner, instituted this suit to recover the taxes and interest which were allegedly overpaid. The court below held that the royalties consti-

tuted income belonging to the community, only one half of which should have been included in the taxpayer's taxable income, and gave judgment for the amount overpaid. The Government appealed.

The opinion and judgment of the lower court were filed September 27, 1946, a few months before this court handed down its opinion in Commissioner of Internal Revenue v. Gray, 5 Cir., 159 F.2d 834. The Gray case is indistinguishable from the case at bar, and all parties agree that unless it is overruled the judgment appealed from must be reversed.

In the Gray case we held that oil royalties from the taxpayer's (husband's) separate property were, under local law, his separate, not community, income. We reviewed the local law and the decisions of the Supreme Court of Louisiana and concluded: (1) That the word "profits," as used in Civil Code, article 2402, enumerating property forming the community, was an erroneous translation from the French text of the Code of 1825, and should read "fruits." (2) That article 2402 of the Civil Code of 1870 is identical with article 2371 of the English text of the Code of 1825. (3) That where the French text of the Code conflicts with the English text, the French text prevails. (4) That under Louisiana law royalties under a mineral lease are not "fruits" but are a share of the product reserved by the owner for permitting another to use his property, and where the lessee delivers to the lessor royalties stipulated and reserved to the lessor in the lease, he is delivering to the lessor a share of the product, the right to which was vested in the lessor by virtue of his ownership of the land. So concluding, we held that the royalties received by the husband from oil and gas leases on his separate realty fell into his separate estate and constituted his separate income for income tax purposes. Appellee's able counsel seems to concede that if the word "profits" in article 2402 of the present Code means "fruits," the decision in the Gray case is correct, for he concedes that "fruits" do not include minerals and timber.[1] His con-

---

[1] Elder v. Ellerbe, 135 La. 990, 66 So. 337; Jackson v. Shaw, 151 La. 795, 92 So. 339; Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769.

tention is that the word "profits" in article 2402 is broader than "fruits" and that it includes royalties from lands containing oil. He asserts that "there was no French text of the Civil Code of 1825; that the Civil Code of 1825 was enacted in English and promulgated or published in both French and English," and, as there was no French text of the Code of 1825 which was the law, the word "profits" appearing in the English text of the Code of 1825 could not have been an erroneous translation of the word "fruits" appearing in the text of the Code of 1825 published in French. As authority for his conclusion that the Civil Code of 1825 was enacted in English, appellee relies on section 15 of article 6 of the Constitution of 1812, providing that all laws passed by the Legislature shall be promulgated, preserved, and conducted in the language in which the Constitution of the United States is written. Appellee argues that since the constitutional article required laws to be passed in the English language, the English text of the Code of 1825 only was enacted by the Legislature, and that the Code as published in French was a translation into French of the English text, and that if any differences existed between them the English text governed. Appellee cites as supporting this contention the following decisions of the Supreme Court of Louisiana: State v. Mix, 8 Rob., La., 549; State v. Ellis, 12 La.Ann. 390; Williams v. Robinson, 5 La.Ann. 110; State v. Judge of Eighth Judicial District Court, 14 La. Ann. 486; and Parish of Lafourche v. Parish of Terrebonne, 34 La.Ann. 1230. The cases cited all deal with ordinary legislative acts. The acts of the Legislature were printed in both French and English from 1808 through 1867. Ordinary statutes were passed in the English form and translated *by a clerk* into the French for publication. The procedure was stated by the Supreme Court of Louisiana in State v. Ellis, 12 La.Ann. 390, 392, in these words:

" * * * We know that the practice of the legislative department under this provision [referring to the article of the Constitution that acts be passed in the English] has been to introduce and carry through the various stages of legislation bills in the English language alone. *They are translated into French for enrollment by a clerk,* but the statutes are adopted in the English only. They are not even required by the Constitution to be translated before receiving the Governor's signature.

*"The English text, therefore, of our ordinary statutes is emphatically the law.* The French version is not the work of the two Houses and the Governor, but *is a mere clerical labor,* its correctness depending upon the skill and accuracy *of the clerk employed."* (Emphasis supplied.)

To solve the problem presented, a review of the three Civil Codes of Louisiana and the decisions of the Supreme Court of that State applying them is necessary. The Code of 1808 was written in French and translated into English; it was then passed and promulgated in both languages.[2] The English and the French of each article were printed on opposite pages, and the Legislature directed that they should "mutually serve to the interpretation of one and the other."[2a] The court followed this injunction by applying the more comprehensive text,[3] or, where the two texts presented two distinct ideas, by holding a compliance with either was sufficient.[4] A like interpretation was followed with reference to ordinary legislative acts prior to the adoption of the Constitution of 1812 which required acts to be passed and promulgated in the English language.[5] After 1812, it was held, as heretofore pointed out, that

---

[2] Moreau Lislet, one of the two jurisconsults who prepared the Code of 1808, stated in argument in Dufour v. Camfranc, 1822, 11 Mart.O.S., La., 675, 701: "We have nothing to do with the imperfections of the translation of the Code—the French text, in which it is known that work was drawn up, leaves no doubt." See also La.Acts of 1806, p. 218; and Acts of 1807, pp. 190–192.

[2a] Sec. 3 of chapter 29 of the Act of March 31, 1808.

[3] Chretien v. Theard, 2 Mart.N.S., La., 582; Saul v. His Creditors, 5 Mart.N.S., La., 569, 612, 613, 16 Am.Dec. 212.

[4] Touro v. Cushing, 1 Mart.N.S., La., 425; Borel v. Borel, 3 La. 30.

[5] Hudson v. Grieve, 1 Mart.O.S., La., 143; State v. Dupuy, 2 Mart.O.S., La., 177; Fink v. Lallande, 16 La. 547.

the "English text of ordinary statutes is emphatically the law." The cases so holding formed the basis for the conclusion of the Supreme Court of the United States in Viterbo v. Friedlander, 120 U.S. 707, 7 S.Ct. 962, 30 L.Ed. 776, that the English text of the Code controlled.

The Code of 1825 was drafted in French and translated into English and printed in both French and English.[6] It was prepared by three jurists who were appointed by the Legislature of Louisiana, pursuant to resolution of date March 14, 1822. These jurists were instructed to *revise the Code of 1808 by amending it* "in such manner as they will deem it advisable" and by adding to it (the Code) "such of the laws as are still in force and not included therein."[7] The draft of their work, known as the Projet, is entitled "Additions and Amendments to the Civil Code of the State of Louisiana, Proposed in Obedience to the Resolution of the Legislature of the 14th March, 1822, by the Jurists Commissioned for That Purpose." Such articles of the Code of 1808 as were not amended, altered, or suppressed, together with the additions and amendments made in the Projet, became what is commonly known as the Civil Code of 1825. This is made clear in Flower v. Griffith, 6 Mart. N.S., La., 89, decided in 1827, in which the Supreme Court said:

"The jurists who were appointed to alter and improve our old Code, in their report to the Legislature, proposed amendments of three kinds. The first, the insertion of new provisions; the second, the modification of those already existing; and the third, the suppression of those articles which were incompatible with the changes they thought proper to recommend * * * The amendments to * * * the old Code were submitted to the Legislature and with some slight alterations adopted. But the remaining provisions in it [the old Code] did not pass a second time under the view of the legislature, nor were they re-enacted. They were left as they originally stood.

"After these amendments were passed, the best way, perhaps, would have been to have printed them separately. The citizen could have then seen at once what change had been made in the old law. But it was thought advisable, from the utility which would result from presenting the whole work together, to direct that the amendments *and* the old Code should be printed in one book."[8]  (Emphasis added.)

■ Contrary to appellee's contention, the amendments and alterations to the Code of 1825 published in the French text are not translations from the English text, as was the case with ordinary statutes after the year 1812. The English text of these amendments forming a part of the Code of 1825 were translations from the French draft. The French text, therefore, is not a translation from 'the English *by a clerk,*

---

[6] Vol. I, La.Legal Archives, p. xxvii; Acts of 1824, p. 146; Acts of 1824, p. 172, approved April 12, 1824, see footnote 8, infra; Davis v. Houren, 1843, 6 Rob., La., 255; Buard v. Lemee, 1845, 12 Rob., La., 243, dealing with an article of the Code of 1825, in the old Code but amended by the Projet to the Code of 1825, holds that the variance in the English text from that of the French text occurred in translating from French into English.

[7] Act of 1822, p. 108.

[8] This is made clear by the act of the Legislature of Louisiana approved April 12, 1824, entitled, "An Act to provide for the printing and the promulgation *of the amendments made to the Civil Code* of the State of Louisiana." That act reads:

"Sec. 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana in general assembly convened, *that the amendments made* to the Civil Code of the State *shall be in force* from the day of their promulgation as hereinafter provided.

"Sec. 2. Be it further enacted that the said Code, as amended, shall be printed in the English and French languages opposite to one another under the title of The Civil Code of the State of Louisiana, * * *.

* * * * * * *

"Sec. 7. Be it further enacted that when the Civil Code shall be printed and received, the promulgation of it shall be made by the Secretary of State, by sending a copy thereof to each of the courts of and within this State, of which transmission the date shall be recorded in the office of the Secretary of State; and one month after said transmission the said Code shall be deemed promulgated, * * *." (Emphasis throughout footnote ours.)

but represents the original text of which the English text enacted by the Legislature is the translation.

The article with which we are dealing, namely, article 2402 of the Revised Civil Code of 1870, is the English text of article 2371 of the Code of 1825, and both are a copy of the English text of article 64 of title V of book III, p. 336, of the Code of 1808, with the phrase "either of right or in fact" added after the word enjoyment in the latter Code. The French text of the corresponding article in the Code of 1808, with the phrase added in French, appears in the Code of 1825. The English and the French texts of article 64, pp. 336-337 of the old Code were transplanted bodily into the Code of 1825 without action by the Legislature except as to the added phrase. Appellee concedes that the Code of 1808 was drawn in the French and that the English text is a translation. The word "profits," therefore, in the English text of article 64 of title V, book III, p. 336, is unquestionably an erroneous translation of the French word "fruits" in the French text of the article.

The English text of the Projet repeatedly and with apparent consistency changed the word "profits" in the English text of the 1808 Code to "fruits" to correspond to the word "fruits" in the corresponding articles of the French text of that Code, and this change in the Projet was consistently adopted into the English text of the Code of 1825 and was reenacted in the Code of 1870. For instance, the word "fruits" in articles 545–547 of the Civil Code of 1870 finds its origin in the English text of the Projet and was adopted in the English text of the Code of 1825 as articles 537, 538, 540. In the English text of the corresponding articles in the 1808 Code, articles 9–14 of book II, title III, p. 112, the word "profits" was used instead of "fruits." Revised Civil Code, article 2386 article 2363 of the Code of 1825 re-

lating to the wife's paraphernal property is the amendment to article 60 of book III, title V of the English text of 1808, made in the Projet. The English text of article 60 of the old Code uses the word "profits," the French text, the word "fruits." In amending article 60, the Projet changed the word "profits" to "fruits," and "fruits" it has remained in article 2363 of the Code of 1825 and article 2386 of the Code of 1870. Article 2402 deals with both husband and wife. "Profits" from the separate property of each falling into the community under that article are of like nature. Of what do these "profits" consist? The answer is found in article 2363 of the English text of the Code of 1825, reenacted as article 2386 of the Code of 1870, dealing with the wife's separate property, and in article 64 of book III, title V of the French text of the Code of 1808 of which the present article 2402 is a translation (laws in pari materia)— the answer is "fruits." "The community consists of the profits, i. e., *the fruits* of the separate property of the spouses fall into the community, also the fruits of their industry." (Emphasis added.) Succession of Webre, 49 La.Ann. 1491, 1494, 22 So. 390, 392. It is not a question of enactment but a question of interpretation.

About the year 1832,[9] there was adopted a construction that has been consistently followed in later cases that the French text prevails where there is ambiguity, variance, or discrepancy between the two texts.[10] The Civil Code of 1870, as set forth in the title, is an amendment and re-enactment of the Code of 1825. It contains no repealing clause. In it were placed acts by which errors in the English text had been corrected to correspond with the French. Some errors, however, remained, since the English text of the Code of 1825 was used as a basis of re-enactment. When questions with reference to these errors have been raised, the Supreme Court of Louisiana has cited the rule applicable to the English

[9] Walls v. Smith, 1832, 3 La. 498.

[10] Davis v. Houren, 1843, 6 Rob., La., 255; Buard v. Lemee, 1845, 12 Rob., La., 243; Egerton v. Third Municipality of New Orleans, 1846, 1 La.Ann. 435; Beaulieu v. Ternoir, 1850, 5 La.Ann. 476; Phelps v. Reinach, 1886, 38 La. Ann. 547; Commercial Germania Trust & Savings Bank v. White, 1919, 145 La. 54, 81 So. 753; Straus v. New Orleans, 1928, 166 La. 1035, 118 So. 125; Sample v. Whitaker, 1931, 172 La. 722, 135 So. 38; Morton Trust Co. v. American Salt Co., C.C., E.D.La., 1906, 149 F. 540.

text of the Codes of 1808 and 1825, and has followed it.[11] Straus v. New Orleans, supra [166 La. 1035, 118 So. 131], contains the following significant language: "The French version of those articles of which the original translation is retained in the Revised Civil Code [1870] are as authoritative as the corresponding articles of the Revised Civil Code."

Article 2402 of the Code of 1870 was a re-enactment without change of the English text of article 2371 of the Code of 1825, which in turn was the English text unchanged of article 64, page 336 of the Code of 1808. Since this is so, the interpretation which would have been made of the English text of those earlier Code articles, where it was at variance with the corresponding French text, must have been adopted along with it.[12] This is necessarily so because the rule of construction of laws in pari materia, article 17, R.C.C.1870, requires it. See note 11, supra. There can be no doubt that "profits" is an erroneous translation of the French word "fruits" and means "fruits." Were this not so, the word "profits" could not possibly comprehend oil royalties, which, as pointed out in the Gray case, are merely a return to the lessor of that which he had reserved from his property.

The argument that oil royalty cannot be return of separate property under the Louisiana law and taxable income under the federal tax statute is without force. The federal statute operates in a uniform manner. It may tax as ordinary income the proceeds from an oil and gas lease even though such proceeds under local law be regarded as resulting from a sale. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199. The federal taxing statute determines what constitutes ordinary income; who owns the income to be taxed is usually determined by local law. Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239.

We find no error in the decision in the Gray case, and accordingly it is reaffirmed.

The judgment appealed from is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

---

11 Phelps v. Reinach, supra; Commercial Germania Trust & Savings Bank v. White, supra; Straus v. New Orleans, supra; Sample v. Whitaker, supra; Morton Trust Co. v. American Salt Co., supra.

12 Lehman v. Lehman, 130 La. 960, 58 So. 829.